**Richard LAIRD, Petitioner,**

v.

**Martin HORN, Commissioner, Pennsylvania Department of Corrections; Gregory White, Superintendent of the State Correctional Institution at Pittsburgh; and Joseph P. Mazurkiewicz, Superintendent of the State Correctional this is a capital case Institution at Rockview, Respondents.**

CIV. A. No. 99–2311.

United States District Court, E.D. Pennsylvania.

September 5, 2001.

DUBOIS, District Judge.

**MEMORANDUM**

I. INTRODUCTION ................................................67

II. PROCEDURAL HISTORY ......................................68

66

III. APPLICATION OF 28 U.S.C. § 2254 ........................................69
 A. The Exhaustion Requirement of § 2254 and Procedural Default ..............69
 1. Exhaustion ...................................................69
 2. Procedural Default ............................................70
 B. Automatic Exhaustion Under the Pennsylvania Supreme Court's
 Mandatory Appellate Review ......................................71
 C. Independent and Adequate Procedural Grounds ..........................73
 1. Introduction .................................................73
 2. The Pennsylvania "Relaxed Waiver" Rule ..........................74
 3. "Previously Litigated" .........................................75
 D. Application of § 2254 .............................................76

IV. DISCUSSION .....................................................77
 A. Guilt Phase Claims ..............................................77
 1. Jury and Prosecutorial Irregularities .............................77
 a. Jury and Prosecutorial Misconduct ...........................77
 b. Jury Tampering ...........................................79
 2. Jury Instructions on Accomplice Liability .........................80
 a. Procedural History .........................................80
 b. Analysis ................................................81
 3. Ineffective Assistance of Counsel in Preparing a Defense ..............85
 4. Prosecutorial Argument During the Guilt Phase Summation .............86
 5. Legally Inconsistent Verdicts and Failing to Poll the Jury .............87
 a. Inconsistent Verdicts ......................................88
 b. Polling Each Juror Individually as to Each Count and Each
 Defendant ...............................................90
 6. Constitutionality of Reasonable Doubt Instruction ...................90
 7. Sufficiency of the Evidence Needed to Establish Kidnapping.............92
 8. The Admission of a Statement Petitioner Made During Trial .............94
 9. Severance ..................................................95
 10. Exculpatory Evidence .........................................97
 B. Penalty Phase Claims ...........................................99
 1. Shackling During the Penalty Phase ..............................99
 2. Jury Instructions on Mitigating Circumstances and *Mills v. Mary-
 land* ......................................................102
 a. *Mills v. Maryland* and its Progeny ..........................102
 b. The Pennsylvania Supreme Court Opinion .......................103
 c. Analysis and Conclusions ...................................105
 3. Mitigating and Aggravating Circumstances—The Trial Court's Intro-
 ductory Comments ...........................................108
 4. Ineffectiveness of Counsel at Sentencing .........................109
 a. Ineffective Assistance of Counsel Under *Strickland* .............112
 b. The Pennsylvania Supreme Court Opinion .......................113
 c. Analysis and Conclusions ...................................114
 5. Coercion of Petitioner's Death Sentence by the Trial Court .............117
 6. "Life means life" Charge .......................................121
 7. Proportionality Review.........................................124
 8. Aggravating Circumstance of Torture .............................125
 9. Prosecutorial Argument at Sentencing ............................127
 a. The Prosecution's Representation of the Jury's Responsibility ........127
 b. Prosecutor's Appeal to Vengeance ............................128
 c. Comments Regarding Petitioner's Silence........................129
 d. Denigration of Petitioner's Penalty Phase Defense .................131
 E. Overall Ineffective Assistance Claim .................................131
 F. Overall Cumulative Prejudice Claim ..................................131

V. CONCLUSION ....................................................131

## I. INTRODUCTION

Currently before the court is the petition for a writ of habeas corpus filed by Richard Laird ("Laird" or "petitioner"). Laird, along with co-defendant Frank Chester ("Chester"), was convicted of first degree murder, kidnapping, and a number of other offenses on May 19, 1988 in the Court of Common Pleas of Bucks County, Pennsylvania. The jury returned a verdict of death on May 21, 1988; on July 19, 1989, the trial court sentenced petitioner to death and to a consecutive sentence of 10 to 20 years on the kidnapping charge.

For the reasons that follow, Laird's petition for a writ of habeas corpus will be granted in part and his first degree murder conviction and death sentence will be vacated and set aside without prejudice to the right of the Commonwealth of Pennsylvania to grant petitioner, within 180 days, a new trial on the first degree murder charge and, if petitioner is found guilty, a new sentencing on that charge, and/or a sentencing on the convictions as to which the trial court did not impose sentence. The petition for a writ of habeas corpus will be denied in all other respects.

The facts underlying petitioner's conviction, as summarized by the Pennsylvania Supreme Court on direct appeal, *Commonwealth v. Chester*, 526 Pa. 578, 586–90, 587 A.2d 1367, 1371–72 (1991) (*"Chester"*), are as follows:

The deceased, Anthony Milano ("Milano," the "deceased" or "decedent") arrived at the Edgely Inn on December 14, 1987 some time after 11:15 p.m. in a 1976 Chevrolet Nova registered in the name of Rose Milano, decedent's mother. Petitioner and Chester had been at the tavern at the Edgely Inn for quite some time prior to Milano's arrival. Both petitioner and Chester had exhibited quarrelsome and aggressive behavior prior to the deceased's arrival—Chester had threatened to assault one of the male guests at the establishment; petitioner was loud and argumentative. At one point during the time the three men were in the tavern, petitioner and Chester taunted Milano as to his masculinity.

At approximately 1:30 a.m. on December 15, Officer Charles McGuigan ("Officer McGuigan") responded, with two fellow officers, to a report of a stolen car found in the parking lot of the Edgely Inn. They began their investigation by interrogating the customers at the Edgely Inn. During that investigation, Officer McGuigan observed Chester, Laird and decedent at the bar. Officer McGuigan requested identification from each of these individuals and was satisfied that they were not involved in the car theft. At approximately 2:10 a.m., while he was still in the parking lot, he observed the deceased, Chester and Laird leave the Edgely Inn together. This testimony was confirmed by the two officers who responded with Officer McGuigan to the stolen car complaint. The three men were last observed leaving the parking lot of the Edgely Inn in the Chevrolet Nova with Milano driving.

On the evening of December 15, 1987, Officer McGuigan responded to a report of a car fire. When he arrived at the scene, he observed a vehicle ablaze and assisted in extinguishing the fire. The vehicle was identified as the 1976 Chevrolet Nova registered in the name of Rose Milano, decedent's mother. A search of a wooded area adjacent to where the automobile was located resulted in the discovery of the body of the deceased. The body was lying face up with the left eye partially open, contusions in the facial area, and multiple slashings of the neck and throat. Police records established

that Rose Milano had reported the deceased as a missing person when he failed to return to the family home in the early morning hours of December 15.

A postmortem examination revealed that decedent had been assaulted about the face and had sustained lacerations about the face, throat, neck, and shoulder. A pathologist concluded that Milano had been kicked and/or punched in both the right and left temple areas and the chin; a hairline fracture at the base of the skull resulted from a blunt instrument striking decedent's head; the lacerations were made by a sharp instrument, consistent with a utility knife; the slashings were hard enough and deep enough to sever the fifth and sixth vertebrae and were too numerous to count; and decedent aspirated on his own blood for five to ten minutes before expiring.

The fire marshal for the township testified that in his opinion, the Milano vehicle fire was deliberately and intentionally ignited. In addition, the Commonwealth presented evidence to establish that at approximately 4:00 a.m., December 15, Chester and Laird approached, on foot, the apartment of a friend of Chester's—Richard Griscavage ("Griscavage"). Griscavage's apartment was located less than a mile from the murder scene. Griscavage testified that both were visibly agitated and covered with blood. Chester attempted to explain their condition by stating that there had been a fight and "the dude is dead." Griscavage took both men to Laird's apartment where they attempted to remove and conceal their bloody clothing. The Commonwealth also produced other witnesses to whom petitioner and Chester made incriminating statements and actions that reflected their complicity in the murder.

The Commonwealth also produced a transcript of a telephone call between Chester and Laird, during which Laird suggested that Chester leave town, recommended ways Chester could pass a polygraph examination, and commented on the Commonwealth's inability to prove a case without evidence. Both defendants testified at trial and admitted to being at the scene.

## II. PROCEDURAL HISTORY

On May 19, 1988, Petitioner Laird and his co-defendant Chester were convicted of first degree murder in the Court of Common Pleas of Bucks County; the jury returned a verdict of death against both defendants on May 21, 1988. In addition to first degree murder, petitioner and Chester were convicted of second and third degree murder; kidnapping, 18 Pa. Cons.Stat. Ann. § 2901; aggravated assault, 18 Pa. Cons.Stat. Ann. § 2702; unlawful restraint, 18 Pa. Cons.Stat. Ann. § 2902; false imprisonment, 18 Pa. Cons. Stat. Ann. § 2903; conspiracy, 18 Pa. Cons.Stat. Ann. § 903; and possession of an instrument of crime, 18 Pa. Cons.Stat. Ann. § 907. *Chester*, 526 Pa. at 586 n. 1, 587 A.2d at 1371 n. 1. Petitioner filed post-verdict motions in the trial court on May 31, 1988, which were denied by opinion and order dated June 29, 1989.

On July 19, 1989, the trial court sentenced petitioner to death on the first degree murder charge and to a "consecutive sentence of not less than 10 nor more than 20 years" on the kidnapping charge. Sentencing Tr. at 6 (July 19, 1989). It does not appear that petitioner was sentenced on any other crimes of which he was found guilty. The Pennsylvania Supreme Court affirmed petitioner's conviction and sentence on direct appeal on March 20, 1991. *Chester*, 526 Pa. 578, 587 A.2d 1367. Laird filed a petition for writ of certiorari to the United States Supreme Court on June 18, 1991; it was denied by order dated October 7, 1991. *Laird v. Pennsylvania*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Petitioner then filed a *pro se* petition for collateral review pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. Ann. § 9541, in the Bucks County Court of Common Pleas on July 22, 1993. The Court of Common Pleas appointed counsel to represent petitioner and an amended petition was filed on January 12, 1995. That court held an evidentiary hearing regarding some of the claims raised in the PCRA petition on May 25, 1995 and concluded the hearing on April 1, 1996. New counsel entered an appearance on July 19, 1996 and additional testimony in support of the petition was heard January 21–28, 1997. The Court of Common Pleas issued an opinion and order denying PCRA relief on September 2, 1997. The Pennsylvania Supreme Court affirmed the order. *Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346 (1999) (*"Laird"*).

Petitioner filed a *pro se* Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 on May 5, 1999. Counsel was thereafter appointed and on September 7, 1999, a counseled Petition for Writ of Habeas Corpus was filed. A supporting Memorandum of Law was filed on December 17, 1999. On February 18, 2000, respondents filed their answer to the petition. A reply was filed on March 23, 2000.

The counseled Petition for Writ of Habeas Corpus superseded the *pro se* petition. Accordingly, in this Memorandum, the Court will only address the claims raised in the counseled petition. For the reasons that follow, the petition will be granted in part.

### III. APPLICATION OF 28 U.S.C. § 2254

#### A. The Exhaustion Requirement of § 2254 and Procedural Default

##### 1. Exhaustion

■ A federal writ of habeas corpus may not be granted to a person incarcerated pursuant to a state court judgment unless he or she has first exhausted the remedies available in state court. As amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254 provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1) (Supp. V 1999).

■ To satisfy this exhaustion requirement, the petitioner must "afford each level of the state courts a fair opportunity to address the claim." *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996); *see McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir.1999). More specifically, a habeas petitioner "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Id.* at 261 (citing *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982)). Making a "somewhat similar state-law claim" is insufficient. *See id.*

The Third Circuit has identified some of the ways in which petitioners may present a federal claim in state court without specifically invoking a portion of the federal constitution or federal statutes. In *Evans v. Court of Common Pleas*, 959 F.2d 1227 (3d Cir.1992), the court observed that a petitioner can assert a claim through "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pat-

tern of facts that is well within the mainstream of constitutional litigation." *Id.* at 1232, *quoted in McCandless,* 172 F.3d at 261–62.

### 2. Procedural Default

When a claim is not exhausted because it was not fairly presented to the state courts, but state procedural rules bar further state relief, the exhaustion requirement is satisfied because "there is an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B)(i) (Supp. V 1999); *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir.2000), *cert. denied,* 531 U.S. 1082, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). However, "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker,* 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred...").

Although procedurally defaulted claims are barred as a general rule, a federal court may reach such claims upon a showing of cause and prejudice or a fundamental miscarriage of justice. As explained by the Third Circuit, "claims deemed exhausted because of a state procedural bar are procedurally defaulted, and federal courts may not consider their merits unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse the default." *Lines,* 208 F.3d at 160 (internal quotation omitted) (citing *Coleman,* 501 U.S. at 731, 111 S.Ct. 2546).

To establish "cause" for procedural default, "the petitioner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Werts v. Vaughn,* 228 F.3d 178, 193 (3d Cir.2000) (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)), *cert. denied,* —— U.S. ——, 121 S.Ct. 1621, 149 L.Ed.2d 483 (2001). As explained by the Third Circuit, the *Murray* Court opined that if a petitioner could, for example, "show[ ] [that] a factual or legal basis for a claim was not reasonably available to counsel or show[ ] interference by government officials sufficient to make compliance impracticable," this would constitute acceptable cause for federal habeas review of the defaulted claim. *Id.* at 193 (citing *Murray,* 477 U.S. at 488, 106 S.Ct. 2639).

To show "prejudice," the petitioner must prove "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original). In essence, this standard requires a petitioner to prove that he was denied "fundamental fairness" at trial. *Werts,* 228 F.3d at 193.

The Court now turns to the way in which these procedural requirements apply in conjunction with Pennsylvania state law, first addressing the question whether certain of petitioner's claims were exhausted by virtue of Pennsylvania's mandatory appellate review of capital cases. The Court will then analyze the independent and adequate state ground doctrine, examining whether two Pennsylvania rules—(1) the rule announced in *Commonwealth v. Albrecht,* in which the Pennsylvania Supreme Court concluded that it would no longer apply a relaxed waiver rule in capi-

tal cases and (2) the rule that previously litigated claims are not available for review during PCRA proceedings—act as procedural bars to federal habeas relief. Finally, the Court will turn to the application of § 2254.

### B. Automatic Exhaustion Under the Pennsylvania Supreme Court's

### Mandatory Appellate Review

█ Petitioner contends that certain of his claims [1] were exhausted in state court by virtue of Pennsylvania's mandatory appellate review of capital cases under 42 Pa. Cons.Stat. Ann. § 9711(h), which provided, at the time of petitioner's sentencing, as follows:

> (1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.
>
> (2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).
>
> (3) The Supreme Court shall affirm the sentence of death unless it determines that:
>
> > (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
> >
> > (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d);
> >
> > . . . .

42 Pa. Cons.Stat. Ann. § 9711(h) (West 1982 & Supp.1991).

Pursuant to this statute, the Pennsylvania Supreme Court must conduct a review of the record in all capital cases, regardless of whether the defendant has preserved particular issues for appeal. Petitioner contends that this mandatory appellate review by the Pennsylvania Supreme Court exhausted his record-based claims of constitutional error—specifically, his claims related to the following issues: (1) verdict coercion (Claim V; Claim IV in petitioner's Reply); (2) improper application of the aggravating circumstance of torture (Claim XI; Claim IX in petitioner's Reply); (3) improper prosecutorial argument (Claim XIII; Claim X in petitioner's Reply); (4) improper jury instructions on first degree murder (Claim X; Claim XIII in petitioner's Reply); (5) insufficient evidence of kidnapping (Claim XVI; Claim XV in petitioner's Reply); (6) the trial court's failure to sever petitioner's trial from the trial of his co-defendant (Claim XVIII; Claim XVII in petitioner's Reply); and (7) improper exclusion of exculpatory evidence (Claim XIX; Claim XVIII in petitioner's Reply).

In support of his argument that these claims are exhausted due to the Pennsylvania Supreme Court's mandatory appellate review, petitioner cites *Beam v. Paskett*, 3 F.3d 1301 (9th Cir.1993). In *Beam*, the Ninth Circuit, in considering the Idaho mandatory appellate review statute, which is nearly identical to the Pennsylvania statute at issue in this case,[2] concluded as follows:

---

**1.** It appears that petitioner makes this claim with respect to claims V, XI, XIII, X, XVI, XVIII, and XIX, as numbered in petitioner's habeas petition and this Memorandum. Unfortunately, the petition and reply did not utilize the same numbering scheme, such that the above listed claims were numbered in petitioner's reply as IV, IX, X, XIII, XV, XVII,

and XVIII, respectively. This occurred in part because Roman numeral one was devoted to procedural considerations in Laird's original petition; accordingly, there is no Claim I.

**2.** The Idaho mandatory appellate review statute provides that "the sentence [of death] shall be reviewed on the record by the Su-

Because the reviewing court has statutory notice of the types of errors for which it is required to examine the record, it is presumed that it has carried out its statutory obligations even when it does not expressly indicate in its opinion that it has done so. As a result, the court's affirmance of the defendant's sentence after mandatory review constitutes at least an implicit rejection of claims of error that fall within its obligatory review even if the defendant has not raised those claims with specificity.

*Id.* at 1306.

The decision of the *Beam* court was based, in part, on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in which the Supreme Court of the United States concluded that the state procedural requirement that the Oklahoma Supreme Court examine the trial record for "fundamental error" did not constitute an independent and adequate state procedural rule as the application of the state requirement was necessarily dependent "on an antecedent ruling on federal law." *Id.* at 75, 105 S.Ct. 1087. By concluding that "fundamental error" included federal constitutional error under Oklahoma law, the Supreme Court determined that, in conducting its mandatory appellate review, "the state court must rule, either explicitly or implicitly, on the merits of [a] constitutional question." *Id.* Accordingly, a state court's mandatory appellate review may serve to exhaust federal constitutional claims when the disposition of a claim is dependent upon an antecedent ruling on federal law.

However, not *all* potential constitutional claims are automatically exhausted by virtue of Pennsylvania's mandatory appellate review. As explained by a judge in the Middle District of Pennsylvania, "the Supreme Court of Pennsylvania has never held that, if it affirms a conviction and sentence under [§ 9711(h)(3) ], all constitutional claims should be deemed to have been resolved against the defendant. Rather, its mandatory review generally seems to be for a sufficiency of the evidence." *Banks v. Horn,* 49 F.Supp.2d 400, 406 (M.D.Pa.1999). In addition, it is significant that federal constitutional claims are enumerated grounds for PCRA relief. *See id.;* 42 Pa. Cons.Stat. Ann. § 9543(a)(2)(i) (West 1998). As observed by the *Banks* court, "[a] reading that all constitutional claims are deemed presented on direct appeal would obviate the need to present such claims on collateral review, a reading at odds with the express language of the PCRA." *Banks,* 49 F.Supp.2d at 406.

Likewise, in *Holland v. Horn,* 2001 WL 704493 (E.D.Pa. Apr.25, 2001), the court rejected petitioner's contention that the Pennsylvania statute resulted in automatic exhaustion of all potential claims, concluding that the "mandatory state supreme court review of death sentences for 'passion, prejudice or any other arbitrary factor' does not constitute a review on the merits of all of Petitioner's potential constitutional claims." *Id.* at *9. However, in *Bronshtein v. Horn,* 2001 WL 767593, at *10 n. 19 (E.D.Pa. July 5, 2001), the court noted that

the Supreme Court of Pennsylvania is required by statute and precedent to conduct a thorough review of the convic-

preme Court of Idaho." Idaho Code § 19–2827(a). The statute further provides that "[w]ith regard to the sentence [of death] the court shall determine: (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbi-

trary factor, and (2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance from among those enumerated in section 19–2515, Idaho Code, and (3) Whether the sentence of death is excessive." *Id.* § 19–2827(c).

tion and sentence in capital cases to determine whether there were any fundamental errors. Even when a petitioner fails to raise a particular constitutional issue, the mandatory review of capital convictions and sentencings required in Pennsylvania is sufficient to exhaust fundamental constitutional claims of the kind raised here by [petitioner].

Upon consideration of the text of the PCRA statute and relevant precedent, this Court concludes that the Pennsylvania mandatory appellate review pursuant to § 9711(h)(3) does not exhaust all possible constitutional claims, but only those claims of fundamental constitutional error that implicate the grounds for relief set forth in § 9711(h)(3)—(1) that the verdict was the product of passion, prejudice or any other arbitrary factor; or (2) that the evidence fails to support the finding of at least one aggravating circumstance. As in *Bronshtein*, some of petitioner's claims constitute fundamental constitutional claims and were thus exhausted by this procedure; petitioner's claim regarding the improper application of the aggravating circumstance of torture, for example, constitutes the type of claim that the Pennsylvania Supreme Court is statutorily required to review. In the discussion of petitioner's claims below, the Court will analyze each claim identified by petitioner as automatically exhausted to determine whether that claim was exhausted by the state supreme court's mandatory review or some other means.

## C. Independent and Adequate Procedural Grounds

### 1. *Introduction*

 "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred un-less the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). As explained by the Third Circuit, for a state rule to provide an adequate basis for precluding federal review of a state prisoner's habeas claim, the rule must have the following attributes: "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." *Doctor v. Walters*, 96 F.3d 675, 683–84 (3d Cir. 1996). *See generally* James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure § 26.1 (1998 & Supp.1999) (discussing the criteria used to determine whether a state procedural rule constitutes an independent and adequate state ground). Such a rule is independent "when resolution of the state procedural law question [does not] depend[ ] on a federal constitutional ruling." *Ake v. Oklahoma*, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

 However, a state procedural rule will not bar federal review of a habeas claim unless that rule was firmly established and regularly followed at the time the default occurred. *See Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (holding that "an adequate and independent state procedural bar to the entertainment of constitutional claims must have been firmly established and regularly followed by the time as of which it is to be applied" in order to preclude federal habeas review) (quotation marks omitted); *Doctor*, 96 F.3d at 684 "A state rule is adequate only if it is 'consis-

tently and regularly applied.'" (quoting *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)). As such, in determining whether a particular state rule is independent and adequate, the Court must identify the state procedural rule, ascertain the time at which the alleged default occurred and then decide whether the rule was firmly established and regularly and consistently applied at the time the alleged default occurred.

The time period on which the Court must focus in this case is not clearly defined due to the complex procedural history of the state PCRA proceedings. As discussed in Part II, the jury returned a verdict of death on May 21, 1988; petitioner was sentenced to death by the trial court on July 19, 1989; his conviction and sentence were affirmed on direct appeal March 20, 1991. Petitioner then filed a *pro se* PCRA petition on July 22, 1993; the PCRA court appointed counsel and an amended petition was filed on January 12, 1995. After an evidentiary hearing and appearance of new counsel, the trial court issued an opinion and order denying PCRA relief on September 2, 1997. Petitioner's initial appellate brief was filed with the Pennsylvania Supreme Court on February 25, 1998. Given the range of dates during which proceedings occurred in this case, the Court must determine whether state procedural rules were firmly established and regularly followed from May 21, 1988 through February 25, 1998. Focusing on this time frame, the Court now turns to two of the state procedural rules at issue in this case—the Pennsylvania relaxed waiver rule and the bar on PCRA relief for previously litigated claims.

### 2. The Pennsylvania "Relaxed Waiver" Rule

■■■ The Commonwealth of Pennsylvania formerly applied a relaxed waiver rule

during PCRA review of capital convictions, whereby the Pennsylvania Supreme Court's "practice [was] to address all issues arising in a death penalty case irrespective of a finding of waiver." *Commonwealth v. Morris*, 546 Pa. 296, 306 n. 11, 684 A.2d 1037, 1042 n. 11 (1996). This relaxed waiver rule was reversed in *Commonwealth v. Albrecht*, 554 Pa. 31, 44, 720 A.2d 693, 700 (1998) as follows: "While it has been our 'practice' to decline to apply ordinary waiver principles in capital cases . . . we will no longer do so in PCRA appeals." (internal citation omitted). In this case, as discussed *supra*, petitioner filed his direct appeal and all submissions related to his PCRA petition before the *Albrecht* rule was clearly established; it thus does not serve to bar federal habeas review as an adequate state procedural ground. Prior to the Pennsylvania Supreme Court's decision in *Albrecht*, the rule applied by the state courts explicitly allowed the Pennsylvania Supreme Court to reach the merits of PCRA petitions in capital cases regardless of whether a claim was previously waived.

In *Commonwealth v. DeHart*, 539 Pa. 5, 25, 650 A.2d 38, 48 (1994), for example, the Pennsylvania Supreme Court explained that although "[a]ppellant concedes that this issue is technically waived because it was not previously raised below, we will nonetheless address it because we have not been strict in applying our waiver rules in death penalty cases." *See also Commonwealth v. Beasley*, 544 Pa. 554, 563, 678 A.2d 773, 777 (1996) (writing that, in spite of the fact that petitioner failed to comply with applicable PCRA rules, and that the claim should be dismissed without a hearing on the merits, "since this is a capital case, this court will address appellant's claims").

In examining the state of Pennsylvania procedural law applicable to death penalty

cases as of November, 1997, the Third Circuit described the procedural terrain as "inhibitively opaque," in part because the Pennsylvania Supreme Court had not yet announced in *Albrecht* that it would no longer observe the relaxed waiver rule in capital cases. *Fahy v. Horn*, 240 F.3d 239, 245 (3d Cir.2001), *petition for cert. filed*, 70 U.S.L.W. 3074 (U.S. June 25, 2001) (No. 01–17). As found by the district court in *Bronshtein v. Horn*, 2001 WL 767593, at *8 n. 17 (E.D.Pa. July 5, 2001), "[b]ecause it is clear that the relaxed waiver doctrine did not fall out of favor in the PCRA context until after the waiver in the instant case occurred [on October, 20, 1998], [petitioner's] second PCRA petition was not dismissed on the basis of an adequate state ground."

Since petitioner had no way of knowing throughout the pendency of his PCRA proceedings that the Pennsylvania Supreme Court was going to change course and decline to apply the relaxed waiver rule in his case, the Court concludes that the Pennsylvania Supreme Court's decision in *Albrecht* is not a state procedural bar that is adequate to preclude habeas review and that any state court findings of default based on *Albrecht* will not foreclose review by this Court. Rather, the older relaxed waiver rule applies to petitioner in analyzing state procedural default as a bar to federal habeas relief. *See Ford*, 498 U.S. at 424, 111 S.Ct. 850; *Doctor*, 96 F.3d at 683–84. Furthermore, as discussed *supra*, since the Pennsylvania Supreme Court has clearly stated that *Albrecht* applies retroactively, the Court concludes that "there is an absence of available State corrective process," 28 U.S.C. § 2254(b)(1)(B)(i), with respect to claims that petitioner may have

inadvertently waived, and this Court will treat any such claims as if they were exhausted.

### 3. "Previously Litigated"

■■■ To be eligible for state post-conviction relief in Pennsylvania, a PCRA applicant must establish that the issues raised in his or her PCRA petition have not been previously litigated. *Albrecht*, 554 Pa. at 41, 720 A.2d at 698. *See* 42 Pa. Cons.Stat. Ann. § 9543(a) (West 1998) ("To be eligible for [PCRA] relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence ... (3) That the allegation of error has not been previously litigated or waived."). As set forth in the version of the Pennsylvania PCRA statute that applies to petitioner:

> For the purpose of this subchapter, an issue has been previously litigated if: (1) it has been raised in the trial court, the trial court has ruled on the merits of the issue and the petitioner did not appeal; (2) the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue; or (3) it has been raised and decided in a proceeding collaterally attacking the conviction or sentence.

42 Pa. Cons.Stat. Ann. § 9544(a) (West 1982 & 1995 Supp.).[3] The Pennsylvania Supreme Court has explained that "[a]n issue has been previously litigated if the highest appellate court in which an appellant could have had review as a matter of right has ruled on the merits of the issue, or the issue has been raised and decided in a proceeding collaterally attacking the conviction or sentence." *Albrecht*, 554 Pa. at 41, 720 A.2d at 698.

---

3. The Court notes that 42 Pa. Cons.Stat. Ann. § 9544 was amended, effective date August 11, 1997, to delete subsection (1). The amended version of the statute does not apply to petitioner as it is only applicable to cases in which the death penalty was imposed on or after January 1, 1996.

■ This state rule may constitute an adequate and independent state procedural ground such that a claim that was previously litigated by petitioner on direct appeal as a state issue and which was subsequently barred on PCRA review as previously litigated is procedurally defaulted and thus unavailable for review by the federal courts unless petitioner is able to demonstrate cause and prejudice, as discussed *supra*. *See, e.g., Blackwell v. Larkins*, 1998 WL 401752, at *4–5 (E.D.Pa. July 6, 1998) (concluding that a claim previously litigated on state grounds and thus not reviewable during PCRA proceedings is procedurally defaulted); *Commonwealth v. Szuchon*, 548 Pa. 37, 693 A.2d 959 (1997) (holding that petitioner is ineligible for PCRA relief on those claims that were previously litigated).

■ Finally, the Court notes that, in order to preserve a claim for federal habeas review, "a petitioner who has raised the claim on direct appeal need not raise it again in a state post-conviction proceeding." *Evans v. Court of Common Pleas*, 959 F.2d 1227, 1230 (3d Cir.1992) (citing *Swanger v. Zimmerman*, 750 F.2d 291, 295 (3d Cir.1984)). Thus, petitioner's claims that were properly presented as federal claims either on direct appeal or during his PCRA proceedings are preserved for federal habeas review.

### D. Application of § 2254

■ Once a federal habeas court finds that a petitioner has exhausted state remedies and that a claim is not procedurally defaulted, the court must determine whether the claim was adjudicated on the merits in state court. As explained by the Third Circuit in *Hameen v. Delaware*, 212 F.3d 226 (3d Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1365, 149 L.Ed.2d 293 (2001), to constitute an adjudication on the merits, the state supreme court must ap-

ply controlling United States Supreme Court precedent. In *Hameen*, the Third Circuit concluded that the Delaware Supreme Court did not rule on one of petitioner's arguments even though it had an opportunity to do so, writing that "we cannot say that the Delaware Supreme Court took into account controlling Supreme Court decisions. This point is critical because under the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only with respect to any claim that was adjudicated on the merits in State court proceedings." *Id.* at 248 (internal quotation omitted).

If the state court resolved the issue on the merits, § 2254 defines two categories of cases in which a state prisoner may obtain federal habeas relief as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .

28 U.S.C. § 2254(d) (Supp. V 1999).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court, interpreting § 2254 as amended by the AEDPA, explained that the "contrary to" clause implicates two different types of cases as follows: "a federal habeas court may grant the writ if the state court [1] arrives at a conclusion opposite to that reached by this Court on a question of law or [2] if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495.

Under the "unreasonable application" clause, a federal writ may issue when the state court identifies the correct legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of a particular case. *Id.* In addition, a state court's determination may be set aside as unreasonable where the state court "unreasonably refuses to extend the governing legal principle to a context in which the principle should control or unreasonably extends the principle to a new context where it should not apply." *Hardcastle v. Horn*, 2001 WL 722781, at *5 (E.D.Pa. June 27, 2001) (citing *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000)); *see also Williams*, 529 U.S. at 407, 120 S.Ct. 1495.

The Supreme Court drew a distinction between incorrect application and unreasonable application of federal law in *Williams*, concluding that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. When inquiring into whether the application of law was unreasonable in a particular case, the federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. In determining whether the state court applied Supreme Court precedent reasonably, habeas courts may consider the decisions of the inferior federal courts. *Matteo v. Superintendent*, 171 F.3d 877, 890 (3d Cir.), *cert. denied sub nom. Matteo v.*

*Brennan*, 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999); *Hardcastle*, 2001 WL 722781, at *5.

In the event that a claim was not adjudicated on the merits by the state courts, the Court will exercise "pre-AEDPA independent judgment." *Hameen*, 212 F.3d at 248. *See* 28 U.S.C. § 2254(d) (Supp. V 1999) (limiting the grant of the writ "with respect to any claim that was adjudicated on the merits in State court proceedings"). In its exercise of independent judgment, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.2001); *Bronshtein v. Horn*, 2001 WL 767593, at *11 (E.D.Pa. July 5, 2001).

Against this doctrinal backdrop, the Court now turns to the merits of petitioner's claims.[4]

## IV. DISCUSSION

### A. Guilt Phase Claims

#### 1. Jury and Prosecutorial Irregularities

##### a. Jury and Prosecutorial Misconduct

█ Petitioner claims a variety of irregularities, including jury and prosecutorial misconduct, and jury tampering in violation of the Sixth, Eighth and Fourteenth Amendments (Claim VI). The misconduct claim is based on the following events: during trial, the court admitted an up-close photograph of the victim's body.[5] The trial court had ordered that the photograph

---

4. The Court has separated the claims into those which arise out of the guilt/innocence phase of petitioner's trial and those which arise out of the penalty phase.

5. This photograph is identified by the Pennsylvania Supreme Court as photograph num-

ber 5 in its PCRA opinion, *Laird*, 555 Pa. at 649, 726 A.2d at 355. In petitioner's brief filed in support of his direct appeal, the photograph is identified as Exhibit C–7. Br. for Appellant at 22 (July 19, 1989).

be cropped by stapling a piece of blue paper over the most gruesome portion of the photo; however, when the photograph came back from the jury room after deliberations, it appeared that the jury had removed the paper and therefore viewed the rest of the photograph.[6] Petitioner contends that this incident constitutes jury misconduct.

Petitioner also contends that these events warrant a finding of prosecutorial misconduct. During a post-trial proceeding to address this issue, the prosecution admitted that when the photo was returned after the guilt phase, the blue paper had been bent to one side and two of the staples holding the paper in place had been removed. Post-trial H'rg Tr. at 3–5 (November 3, 1988). Petitioner claims that the prosecutor's failure to disclose his knowledge of the jury's misconduct to the court constituted prosecutorial misconduct as prosecutors generally have a duty to disclose evidence which is exculpatory and to correct errors that may harm a defendant. *See Giglio v. United States,* 405 U.S. 150, 153–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

This claim, however, is procedurally defaulted and cannot be reached by this Court on federal habeas review. Petitioner presented this claim on direct appeal as a matter of state evidence law, not as a federal constitutional issue. *See Chester,* 526 Pa. at 592–93, 587 A.2d at 1374 (dis-

cussing the admissibility of photographs of a murder victim under state law; concluding that the admission of several photographs of the deceased was not an abuse of discretion). As a result, the PCRA court concluded that the claim had been previously litigated and that the court was thus barred from addressing the claim on collateral review as a matter of state procedure. *Laird,* 555 Pa. at 650, 726 A.2d at 356 (holding that petitioner's claim of jury and prosecutorial misconduct "has been finally litigated and petitioner cannot obtain post-conviction relief on this basis") (citing 42 Pa. Cons.Stat. Ann. § 9544(a)(2)); *see supra* Part III(C)(3) (discussing state procedural rule preventing PCRA review of previously litigated claims). In addition, the PCRA court observed that the "trial court found any error in the jury's viewing of the cropped photo harmless in light of the other photos [admitted at trial]." *Laird,* 555 Pa. at 649, 726 A.2d at 355.

Petitioner attempts to excuse the failure to raise the claim as a federal issue on the ground that his appellate counsel was inadequate. In evaluating an ineffective assistance of appellate counsel claim, this Court applies the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a showing that counsel was objectively unreasonable and that counsel's deficient performance prejudiced the defense such that there is a reasonable probability that but for counsel's inadequacies, the outcome of the prior proceeding would have been dif-

---

6. As a general rule, when a jury is exposed to extra-record information, as apparently happened here, the trial court has an obligation to determine whether the jury, with proper instructions, can be relied upon to judge the case impartially and confine its deliberations to the evidence on record. *Government of Virgin Islands v. Dowling,* 814 F.2d 134, 138 (3d Cir.1987) (citing *Smith v. Phillips,* 455

U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). Voir dire is generally recognized as the appropriate method for making such a determination; under certain circumstances, in the absence of such a hearing, "proof of actual prejudice is excused and a new trial is warranted." *Government of Virgin Islands v. Weatherwax,* 20 F.3d 572, 580 (3d Cir.1994).

ferent. *See Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (stating that the "proper standard for evaluating [petitioner's] claim that appellate counsel was ineffective in neglecting to file a merits brief is that enunciated in *Strickland v. Washington* ").

 Under *Strickland,* judicial review of counsel's performance is highly deferential; the Court must indulge a strong presumption that counsel's performance falls within the wide range of that which constitutes reasonable professional assistance. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Counsel did raise this issue on appeal, but did not present it as a federal constitutional issue. Under those circumstances, counsel's performance was not objectively unreasonable as required under *Strickland.*

The Court concludes that it is precluded from reaching this claim as it was never fairly presented to the state court as a federal issue and petitioner cannot excuse his procedural default.

### b. Jury Tampering

Petitioner alleges that jury tampering occurred on the morning of May 21, 1988 when the sequestered jury was returning to court to continue its deliberations during the penalty phase. In 1995, one of the jurors, Mr. Maurizzio, reported that, as they were leaving the hotel at which they were sequestered, he commented to another juror that he hoped they would be able to reach a verdict. In response, he heard the following remark, possibly made by a tipstaff or deputy clerk: "[W]ell there's only one decision you can make." *Laird,* 555 Pa. at 650, 726 A.2d at 356. The

PCRA court held an evidentiary hearing on this issue on May 25, 1995 in which Mr. Maurizzio recounted the above exchange. An additional hearing was then held April 1, 1996 in which all but two of the remaining jurors were questioned about the exchange, and Mr. Maurizzio was recalled for additional questioning.[7]

Petitioner argues that this statement improperly forced the jury to reach a verdict of death; and the fact that the comment could have been delivered by a court officer heightens the possible prejudice. Further, petitioner argues, the inability of the PCRA court to question two of the jurors makes it impossible to assess whether the comment was harmless. Respondents argue in response that the remark was ambiguous[8] and cannot be used as a reason to overturn the verdict; it was not clear who had made the statement; and that none of the jurors testified that they were influenced in any way by the comment.

 When faced with evidence of a private communication, contact, or tampering directly or indirectly with a juror during trial, the trial court is required to conduct a hearing to determine the prejudicial effect, if any, of such an occurrence. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). In reviewing a federal habeas challenge to a state court conviction on the basis of jury tampering, the Court must determine whether the state trial court conducted a hearing to address such allegations. *See Smith v. Phillips,* 455 U.S. 209, 215–17, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

In this case, the trial court did not have an opportunity to conduct such a hearing

---

7. The two jurors who were not questioned were unavailable—one was deceased and the other had recently suffered a heart attack. *See Laird,* 555 Pa. at 650, 726 A.2d at 356.

8. The PCRA court found that even "[j]uror Maurizzio testified that he thought the speaker could equally have meant that the verdict should be innocence or guilt." *Laird,* 555 Pa. at 651, 726 A.2d at 356.

during trial as the incident was not reported to the trial judge until the spring of 1995. The hearing held by the PCRA court in May 1995 provided petitioner an adversarial hearing to determine whether there was any jury prejudice and the court concluded that there was none. *Laird*, 555 Pa. at 651–52, 726 A.2d at 356–57. Specifically, the PCRA court held a hearing and determined that there was no reasonable likelihood that the communication prejudiced the jury. This Court concludes that the PCRA court's determination does not result in a decision that is contrary to, or an unreasonable application of, federal law; nor is it an unreasonable determination of the facts. Accordingly, petitioner is not entitled to habeas relief on this issue.

As discussed *supra*, petitioner's claim based on the photograph is procedurally defaulted; the claim of jury tampering does not entitle petitioner to relief. Accordingly, this claim (Claim VI) does not provide a basis for federal habeas relief.

### 2. Jury Instructions on Accomplice Liability

#### a. Procedural History

■ Petitioner claims that the jury instruction given on accomplice liability at trial was improper, arguing that the instruction unconstitutionally relieved the prosecution of its burden of proving all elements of first degree murder (Claim X). As a preliminary matter, respondents contend that this claim is procedurally defaulted as it was not raised on direct appeal. Although it is true that this claim was first raised during petitioner's PCRA proceeding, the procedural history of this claim is complex and warrants explanation.

A similar claim to the one petitioner now raises was raised on direct appeal by petitioner's co-defendant Chester; petitioner did not personally raise this claim until PCRA review. Laird's and Chester's direct appeals were consolidated for review by the Pennsylvania Supreme Court. *See Chester*, 526 Pa. at 613, 587 A.2d at 1384 ("Appellant [Chester] submits that counsel was ineffective for failing to object to the trial court's failure to instruct the jury to find specific intent as a prerequisite for accomplice liability.").

Apparently as a result of Chester having raised the claim on direct appeal, when petitioner raised it during PCRA review, the Pennsylvania Supreme Court rejected the claim as follows:

> Petitioner next claims that the trial court erroneously charged the jury on the issue of specific intent for first degree murder where the defendant is charged as an accomplice. This issue was presented on direct appeal as an allegation of ineffectiveness of trial counsel for failure to object to the charge as given. . . . Petitioner attempts to relitigate this claim by attacking appellate counsel's ineffectiveness for failing to prevail on this claim in the direct appeal. Post-conviction relief cannot be obtained on a previously litigated claim merely by arguing appellate counsel's ineffectiveness and presenting new theories of relief.

*Laird*, 555 Pa. at 646, 726 A.2d at 354. Notwithstanding the fact that Chester, not Laird, raised this claim on direct appeal, the Pennsylvania Supreme Court treated the claim as previously litigated and thus barred from review in PCRA proceedings. In doing so, the state court disposed of this claim quite differently from another claim raised by Chester and not Laird on direct appeal, about which the PCRA court wrote: "as noted in the trial court opinion disposing of post-trial motions, only co-defendant Chester raised this issue [on direct appeal], it has not been finally litigated by petitioner." *Laird*, 555 Pa. at 647, 726 A.2d at 354–55.

Despite respondents' contention that Laird's failure to raise this claim during his direct appeal constitutes procedural default, the Court concludes that this claim is not procedurally defaulted and that it may review the claim on the merits.[9] As an initial matter, the Court finds that this claim is exhausted; the Pennsylvania Supreme Court rejected the claim on PCRA review, there is thus "an absence of available State corrective process." 28 U.S.C. § 2254(b)(1)(B)(i) (Supp. V 1999). In addition, there was no procedural default due to waiver. As discussed *supra* Part III(C)(2), petitioner filed his direct appeal and PCRA petition at a time when Pennsylvania applied a relaxed waiver rule in capital cases. Since *Albrecht*'s rejection of the relaxed waiver rule as a state procedural bar was not clearly established at the time petitioner filed his direct appeal, this Court does not consider the *Albrecht* rule as a state procedural bar to federal habeas review in this case.

Because the Pennsylvania Supreme Court rejected this claim without ever having reviewed it, the AEDPA does not limit the grant of the writ with respect to this claim.[10] 28 U.S.C. § 2254(d) (Supp. V 1999) (limiting the grant of a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings"). Accordingly, this Court will use pre-AEDPA independent judgment in analyzing the merits of this claim. *See Appel v. Horn*, 250 F.3d 203, 210–12 (3d Cir.2001); *Hameen v. State of Delaware*, 212 F.3d 226, 248 (3d Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1365, 149 L.Ed.2d 293 (2001). As jury instruction issues present pure questions of law, the Court reviews this claim de novo. *Appel*, 250 F.3d at 210.

### b. Analysis

Pennsylvania law requires the prosecution to prove specific intent to kill beyond a reasonable doubt in order to convict a defendant of first degree murder. *See* 18 Pa. Cons.Stat. Ann. § 2502 (West 1998) (last amended Apr. 28, 1978).[11] Accordingly, a jury charge that relieves the prosecution of the need to prove specific intent to kill in a first degree murder case is impermissible. In the context of accomplice liability, this rule was explained by the Penn-

---

9. In the alternative, petitioner argues that this claim is not procedurally defaulted as a result of the Pennsylvania mandatory appellate review, *see supra* Part III(B). Having concluded that this claim is exhausted and is not procedurally defaulted, the Court declines to reach the issue of whether this claim is one that is automatically exhausted pursuant to the Pennsylvania automatic appellate review statute, 42 Pa. Cons.Stat. Ann. § 9711(h).

10. As noted above, the Pennsylvania Supreme Court addressed the accomplice liability instruction on petitioner's direct appeal as a claim raised by Chester. *See Chester*, 526 Pa. at 613–14, 587 A.2d at 1384–85 (concluding that the language of the instruction mirrors the language of the Pennsylvania statute defining accomplice liability and that the trial court instructed the jury on the requirement that specific intent to kill must be found to find a defendant guilty of first de-

gree murder). However, the accomplice liability instruction given at trial unconstitutionally relieved the prosecution of its burden of establishing the specific intent element of first degree murder. *See* discussion *infra*.

11. The Pennsylvania Criminal Code provides, in pertinent part, as follows:

> (a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
> . . . .
> (d) Definitions.—. . . .
> . . . .
> "Intentional killing." Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa. Cons.Stat. Ann. § 2502 (West 1998) (last amended Apr. 28, 1978).

82

sylvania Supreme Court in *Commonwealth v. Bachert*, 499 Pa. 398, 406, 453 A.2d 931, 935 (1982): "[t]o determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one which the accomplice harbored and cannot depend upon proof of intent to kill only in the principal." *See also Commonwealth v. Huffman*, 536 Pa. 196, 198–99, 638 A.2d 961, 962 (1994) (concluding that a jury instruction on accomplice liability was a misstatement of the law when the charge informed the jury it could find an accomplice guilty of first degree murder without finding that the accomplice had specific intent to kill); *Commonwealth v. Wayne*, 553 Pa. 614, 632, 720 A.2d 456, 464 (1998) ("To allow a conviction for first degree murder to stand without proof beyond a reasonable doubt establishing that the accused actually harbored the specific intent to kill, would be unconscionable."), *cert. denied*, 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999).

The charge that the Pennsylvania Supreme Court rejected in *Huffman* provided:

> [I]n order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

*Huffman*, 536 Pa. at 198–99, 638 A.2d at 962. In evaluating this instruction, the *Huffman* court concluded that this charge is "a patently erroneous statement of the law," *Huffman* 536 Pa. at 199, 638 A.2d at 962, because the charge allowed the jury to

reach a verdict of first-degree murder without a finding of the requisite mental state—specific intent to kill—on the part of the accomplice. *Id.* The Court thus concluded that "[a]n inaccurate jury instruction, such as the accessorial and co-conspiratorial liability instruction in the case *sub judice*, is obviously no less questionable than was the inaccurate instruction as to the burden of proof which we found was not harmless error [in another case]...." *Id.* at 200, 638 A.2d at 963.

The Third Circuit has held that improper jury instructions on the specific intent requirement of first degree murder under Pennsylvania law may result in a violation of a petitioner's right to a fair trial pursuant to the Due Process Clause of the Fourteenth Amendment. *Smith v. Horn*, 120 F.3d 400, 410 (3d Cir.1997). In *Smith*, upon concluding "from a fair reading of the jury instructions that there is a reasonable likelihood that the jury convicted [petitioner] of first-degree murder without finding beyond a reasonable doubt that [petitioner] intended that [the victim] be killed," the court found the charge impermissible. *Id.*

■ As explained by the Third Circuit, under Pennsylvania law today, and at the time of Laird's conviction, "an accomplice or co-conspirator in a crime during which a killing occurs may not be convicted of first-degree murder unless the Commonwealth proves that he harbored the specific intent to kill." *Smith*, 120 F.3d at 410 (citing 18 Pa. Cons.Stat. Ann. § 2502(a) (West 1983)); *Wayne*, 553 Pa. at 632, 720 A.2d at 464; *Huffman*, 536 Pa. at 199, 638 A.2d at 962; *Bachert*, 499 Pa. at 406, 453 A.2d at 935. Significantly, "[t]his is so even where the identity of the actual killer is unknown." *Smith*, 120 F.3d at 410.

■ In evaluating a claim that a jury instruction was improper, the Court must determine whether the challenged instruc-

tion created a situation where the "jury is clearly instructed by the court that it may convict a defendant on an impermissible legal theory, as well as on a proper theory or theories," or a case in which an "instruction is ambiguous and therefore subject to an erroneous interpretation." *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). With respect to the accomplice liability instruction given by the trial court in this case, the Court concludes that the jury instruction falls into the latter "ambiguous" category.[12]

In evaluating a jury instruction, the Court's analysis " 'must focus initially on the specific language challenged.' " *Smith,* 120 F.3d at 411 (quoting *Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)). The Court then considers the allegedly constitutionally infirm language in the context of the jury charge as a whole. *Id.* (citing *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Flamer v. Delaware,* 68 F.3d 736, 752 (3d Cir.1995); *Kontakis v. Beyer,* 19 F.3d 110, 115–16 (3d Cir.1994)). The central inquiry is " 'whether there is a reasonable likelihood that the jury has applied the challenged

instruction in a way' that violates the Constitution." *Estelle,* 502 U.S. at 72, 112 S.Ct. 475 (quoting *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

The Court first turns to the specific language of the charge challenged by petitioner. At the close of the guilt/innocence phase of petitioner's trial, the trial court instructed the jury on accomplice liability as follows:

> You may find a defendant guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime.
>
> A person is guilty of a particular crime if he is an accomplice of another person who commits that crime. A defendant does not become an accomplice merely by being present at the scene or knowing about a crime. He is an accomplice, however, if with the intent of promotion or facilitating commission of *a* crime he solicits, or commands or encourages or requests the other person to commit it or if he aids, agrees to aid, or attempts to aid the other person in planning the crime or committing the

---

**12.** On this issue, the Court finds the Supreme Court's jurisprudence on unconstitutional presumptions instructive. The United States Supreme Court has explained that where there is a reasonable possibility that the jury relied on an unconstitutional understanding of the jury instructions as to intent in reaching a guilty verdict, the jury verdict must be set aside:

> The Court today holds that contradictory instructions as to intent—one of which imparts to the jury an unconstitutional understanding of the allocation of burdens of persuasion—create a reasonable likelihood that a juror understood the instructions in an unconstitutional manner, unless other language in the charge *explains* the infirm language sufficiently to eliminate this possibility. If such a reasonable possibility of an unconstitutional understanding exists, "we

have no way of knowing that [the defendant] was not convicted on the basis of the unconstitutional instruction." *Sandstrom [v. Montana,* 442 U.S. 510, 526, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)]. For this reason, it has been settled law since *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), that when there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law in reaching a guilty verdict, that verdict must be set aside.

*Francis v. Franklin,* 471 U.S. 307, 323 n. 8, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (emphasis in original). In *Francis,* the instructions given at trial improperly shifted the burden of persuasion with respect to the intent element to the defendant. *See Francis,* 471 U.S. at 321–22 n. 7, 105 S.Ct. 1965.

crime.... *You may find the defendant guilty of a particular crime on the theory that he was an accomplice so long as you are satisfied beyond a reasonable doubt that the crime was committed and the defendant was an accomplice of the person who committed it.*

Trial Tr. at 664–65 (May 19, 1988) (emphasis added).

The Court subsequently instructed the jury on the specific elements of first degree murder under Pennsylvania law:

Murder in the first degree. You may find a defendant guilty of first degree murder if you are satisfied that the following four elements have been proved beyond a reasonable doubt:

First, that Anthony Milano is dead.

Second, that a defendant or an accomplice of the defendant killed him.

Third, that killing was with specific intent to kill.

And, fourth, that the killing was with malice as I have defined that term for you.

A killing is with specific intent to kill if it is willful, deliberate, and pre-meditated; that is, if it is committed by a person who has a fully informed intent to kill and is conscious of his own intent.

Trial Tr. at 686–87 (May 19, 1988).

■■■ Upon reviewing the jury instructions in their entirety, the Court concludes that there is a reasonable likelihood that the jury applied the court's instructions in a way that relieved the prosecution of establishing beyond a reasonable doubt that Laird individually harbored a specific intent to kill Milano. *See Smith*, 120 F.3d at 410. As discussed *supra*, " '[t]o determine the kind of homicide of which the accomplice [defendant] is guilty, it is necessary to look to *his* state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one which the ac-

complice harbored and cannot depend upon proof of intent to kill only in the principal.' " *Id.* (emphasis in original) (quoting *Bachert*, 499 Pa. at 406, 453 A.2d at 935).

In petitioner's case, the jury was not specifically instructed that it needed to find that *both* defendants harbored specific intent to kill in order to convict them *both* of first degree murder. Rather, the instruction on accomplice liability was reasonably likely to lead the jury to conclude that it need only find that petitioner solicited, commanded, encouraged or requested the facilitation of *a crime* and the crime of first degree murder was committed—by either defendant. In essence, the first degree murder charge given by the trial court in this case required only that the jury find that (1) the victim died; (2) a defendant or his accomplice killed the victim; (3) "that killing was with specific intent to kill"; and (4) the killing was with malice. Although this is a correct statement of the law when applied to an individual defendant, the charge did not explain to the jury that, in order to convict *both* petitioner and his co-defendant of first degree murder, it had to find that each defendant harbored specific intent to kill. *See Bachert*, 499 Pa. at 406, 453 A.2d at 935; *Huffman*, 536 Pa. at 199, 638 A.2d at 962.

A recent case in this district concerned a similarly defective conspiracy charge in which the jury was instructed that it could find the defendant guilty of first degree murder if he "was a co-conspirator of one who had the specific intent to kill." *Bronshtein v. Horn*, 2001 WL 767593, at *13, 14 (E.D.Pa. July 5, 2001). In *Bronshtein*, the court determined that this instruction "allowed the defendant to be convicted without proof of his specific intent." *Id.* at *17. Accordingly, the *Bronshtein* court held that the instructions given at

trial impermissibly relieved the prosecution's burden of proving every element of first degree murder beyond a reasonable doubt in violation of the Fourteenth Amendment Due Process Clause and that petitioner was entitled to habeas relief as a matter of law. *Id.* at *17.

Although the charge given in this case was different from the charge in *Bronshtein,* both charges suffer from the same deficiency—they erroneously instructed the jury that a defendant could be found guilty upon concluding that he had the intent to commit a crime with his accomplice or co-conspirator; it was not made clear to the jurors that they must find that a defendant had specific intent to kill in order to convict that defendant of first degree murder. The Court concludes that this error was not harmless. Upon a review of the record, it cannot be said that "the error had no substantial and injurious effect or influence on the jury's verdict." *Smith,* 120 F.3d at 419 (quotation marks omitted).

Given the reasonable likelihood that the jury applied the trial court's instructions in a way that relieved the prosecution of proving every element of first degree murder beyond a reasonable doubt, due process requires that defendant's first degree murder conviction be overturned. Thus, petitioner is entitled to habeas relief on this claim (Claim X) as a matter of law and his first degree murder conviction will be vacated and set aside without prejudice to the right of the Commonwealth of Pennsylvania to grant petitioner, within 180 days, a new trial on the first degree murder charge and, if petitioner is found guilty, a new sentencing on that charge, and/or a sentencing on the convictions as to which the trial court did not impose sentence.

### 3. Ineffective Assistance of Counsel in Preparing a Defense

Petitioner argues that his trial counsel was ineffective by admitting defendant's presence at the crime scene, but denying his culpability by characterizing him as an innocent bystander and placing blame for the murder on Chester, petitioner's co-defendant (Claim XII). It is petitioner's contention that this approach amounted to ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments, as the defense presented at trial conceded much of the prosecution's case. Laird also argues that counsel should have pursued a diminished capacity defense based on petitioner's intoxication and/or his mental impairments, including Post–Traumatic Stress Disorder, Attention Deficit Disorder, and organic brain damage at the time of the murder.

Respondents contend that counsel's tactics were not only reasonable but necessary, given that petitioner consistently maintained his innocence. Further, respondents aver that a diminished capacity defense is extremely hard to assert in Pennsylvania and there was no need for defense counsel to present expert testimony about petitioner's intoxication due to the amount of testimony at trial regarding the defendants' heavy drinking on the night of the murder.

To establish ineffective assistance of trial counsel, petitioner must demonstrate that counsel's performance was objectively unreasonable and that petitioner was prejudiced as a result—that but for counsel's deficiencies, the outcome of the prior proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the *Strickland* test, judicial review of counsel's performance is highly deferential; the Court must indulge a strong presumption that counsel's performance falls

within the wide range of that which constitutes reasonable professional assistance. *See id.* at 689, 104 S.Ct. 2052. Further, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions with the exercise of reasonable professional judgment. *See id.* at 690, 104 S.Ct. 2052.

The Pennsylvania Supreme Court found that petitioner failed to demonstrate that his trial counsel's actions were objectively unreasonable. Rather, that court concluded that, in order to present a diminished capacity defense, trial counsel would have had to put on a defense that contradicted petitioner's own testimony and that counsel cannot be required to do so. *See Laird,* 555 Pa. at 645–46, 726 A.2d at 353–54. The Pennsylvania Supreme Court further concluded that, to the extent trial counsel failed to investigate a possible diminished capacity defense, such lack of investigation was reasonable in light of the strategic choices made at trial. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

The Pennsylvania Supreme Court applied the correct rule of law with respect to this claim in a reasonable manner. This Court thus concludes that this claim (Claim XII) does not present a basis for the issuance of a federal writ.

### 4. Prosecutorial Argument During the Guilt Phase Summation

Petitioner contends that the prosecution impermissibly tried to inflame the jury and appeal to vengeance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments (Claim XIII(B)) in his guilt phase summation to the jury.[13] At the conclusion of the guilt phase of trial, the prosecutor made the following remarks during his closing statement:

> We're here because together with the coldness of heart, that's hard to believe, and with an evil intention of mind, that we just sometimes can't comprehend, and with ice water running through their veins and a coldness of disposition, they treated him like a cheap piece of tenderloin and they carved him up.

Trial Tr. at 638 (May 18, 1988). In response to petitioner's claim regarding this portion of the summation, respondents argue that petitioner failed to present his objection as a federal constitutional issue to the state court and that it is thus procedurally defaulted.

On direct review, petitioner presented this issue as one of state law, citing state cases regarding what constitutes permissible prosecutorial conduct under state law. *See, e.g., Commonwealth v. Johnson,* 516 Pa. 527, 533 A.2d 994 (1987); *Commonwealth v. Lipscomb,* 455 Pa. 525, 317 A.2d 205 (1974), *cited in* Br. for Appellant at 30 (July 19, 1989). The Pennsylvania Supreme Court concluded on direct review that these remarks were within the prosecutor's wide discretion of appropriate argument to the jury. The court wrote that the remarks "were not a deliberate attempt to destroy the objectivity of the fact finder, but merely summarized the evidence presented at trial with the oratorical

13. This claim regarding improper prosecutorial argument during the guilt/innocence phase was presented to the Court as part of a larger claim in which petitioner contends that the prosecutor engaged in improper argument during both the guilt/innocence phase and the penalty phase. As mentioned supra note 4, this Court has separated petitioner's claims into those which arise out of the guilt/innocence phase and those which arise out of the penalty phase. For the Court's discussion of the penalty phase aspect of this claim, *see* Part IV(B)(9), *infra.*

flair permitted during argument." *Chester,* 526 Pa. at 600, 587 A.2d at 1378. On PCRA review, petitioner did not present his objection to this portion of the prosecutor's argument; the claim presented to the PCRA court on this issue exclusively concerned the propriety of closing argument during sentencing. *See* Initial Br. of Appellant at 60 (Feb. 24, 1998); *see also Laird,* 555 Pa. at 655, 726 A.2d at 358–59 (concluding that the penalty phase prosecutorial argument issue had been finally litigated on direct appeal). As discussed *supra* Part III(A)(1), in order to preserve a claim for review on federal habeas, ordinarily a habeas petitioner must present a claim's factual and legal substance to the state courts in such a manner that the state courts are put on notice that a federal claim is being asserted. *See McCandless v. Vaughn,* 172 F.3d 255, 261–62 (3d Cir.1999).

This Court concludes that this claim is one that was exhausted by virtue of the Pennsylvania state mandatory appellate review. *See supra* Part III(B). The Pennsylvania mandatory appellate review statute expressly requires the Pennsylvania Supreme Court to review a sentence of death to determine whether it was "the product of passion, prejudice or any other arbitrary factor." 42 Pa. Cons.Stat. Ann. § 9711(h)(3)(i) (West 1982 & 1991 Supp.) (last amended Dec. 22, 1989). As this claim explicitly challenges the prosecutor's appeal to the jury's passion and prejudice, the Court determines that the presentation of this claim on direct appeal was sufficient to put the state supreme court on notice that it must conduct a searching review of the prosecutor's closing statement to ensure that it did not violate the state or federal constitutions.

In evaluating whether a prosecutor's argument was permissible, the United States Supreme Court has explained that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). *See Moore v. Morton,* 255 F.3d 95, 105 (3d Cir.2001) ("[P]rosecutorial misconduct may 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'") (modification in original) (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868); *see also Werts v. Vaughn,* 228 F.3d 178, 197–98 (3d Cir. 2000) ("[F]ederal habeas relief may be granted when the prosecutorial misconduct may so infect the trial with unfairness as to make the resulting conviction a denial of due process.") (internal quotations and modification omitted), *cert. denied,* —— U.S. ——, 121 S.Ct. 1621, 149 L.Ed.2d 483 (2001).

Although the prosecutor's argument in this case may have been somewhat inflammatory, it did not rise to the level of prosecutorial misconduct that constitutes a constitutional deprivation. Otherwise stated, the argument did not so infect the trial as to make the conviction a denial of due process. Accordingly, the Court concludes that this claim (Claim XIII(B)) is without merit and does not provided a basis for federal habeas relief.

### 5. *Legally Inconsistent Verdicts and Failing to Poll the Jury*

Petitioner argues that he is entitled to relief because the jury verdicts were inconsistent and because the jurors were not individually polled regarding each juror's finding as to each defendant on each count of the indictment (Claim XIV) in violation of the Sixth, Eighth and Fourteenth Amendments. At trial, petitioner and his

co-defendant were convicted of first, second and third degree murder in addition to a number of other crimes as set forth *supra* Part II. In Pennsylvania, first degree murder requires specific intent, 18 Pa. Cons.Stat. Ann. § 2502(a); whereas second degree murder is defined as murder in the perpetration of a felony, *id.* § 2502(b), and third degree murder comprises "[a]ll other kinds of murder." *Id.* § 2502(c). *See* 18 Pa. Cons.Stat. Ann. § 2502 (West 1998) (last amended Apr. 28, 1978). When the jury rendered its verdict, the trial court asked each juror whether the verdict just read was his or her verdict, but did not inquire into each count of the indictment with respect to each defendant.

### a. Inconsistent Verdicts

It is petitioner's contention that the verdicts of first, second and third degree murder are inconsistent; he argues that the offenses are mutually exclusive and the trial court's decision to take the verdict as a conviction of first degree murder violated petitioner's right to a trial by jury, due process, "and to a reliable verdict in a capital case." Pet.'s Mem. of Law at 178 (Document No. 17, filed December 17, 1999). Based on this theory, petitioner contends that the trial court should have required the jury to continue deliberating until it reached a verdict on only one of the murder counts. Respondents argue that the evidence presented at trial was sufficient to uphold all three murder convictions. The Pennsylvania Supreme Court agreed with respondents, writing on PCRA review that there was sufficient evidence to support petitioner's conviction on all three murder charges and that "[c]onsistency in verdicts is not required where there is evidence to support each verdict." *Laird,* 555 Pa. at 648, 726 A.2d at 355.

As a general rule, the United States Supreme Court has held that "inconsistent verdicts are constitutionally tolerable." *Dowling v. United States,* 493 U.S. 342, 353–54, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). In *Powell,* however, the Supreme Court expressly withheld judgment on whether the Constitution permits more than one finding of guilty on mutually exclusive offenses. *See id.* at 69 n. 8, 105 S.Ct. 471. ("Nothing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other."). Subsequently, the Third Circuit clarified that the exception to the rule allowing inconsistent verdicts "only operates in those situations where a jury has convicted a defendant of two crimes and those *convictions* are mutually exclusive." *United States v. Gross,* 961 F.2d 1097, 1107 (3d Cir.1992) (emphasis in original). *See also Buehl v. Vaughn,* 166 F.3d 163, 178–79 (3d Cir.) (reaffirming the Third Circuit's holding in *Gross* ), *cert. dismissed,* 527 U.S. 1050, 119 S.Ct. 2418, 144 L.Ed.2d 815 (1999).

As explained in *Masoner v. Thurman,* 996 F.2d 1003 (9th Cir.1993):

[A] due process challenge to a jury verdict on the ground that convictions of multiple counts are inconsistent with one another will not be considered if the defendant cannot demonstrate that the challenged verdicts are necessarily logically inconsistent. If based on the evidence presented to the jury any rational fact finder could have found a consistent set of facts supporting both convictions, due process does not require that the convictions be vacated.

*Id.* at 1005, *quoted in Buehl,* 166 F.3d at 178. *See generally United States v. Grier,*

866 F.2d 908, 928–29 (7th Cir.1989) (concluding that inconsistent verdicts are not grounds for reversal of a criminal conviction).

With respect to homicide convictions under Pennsylvania law, the Third Circuit has concluded that "[a]n examination of the statutory definitions of first degree murder, third degree murder, and involuntary manslaughter does not reveal any apparent logical inconsistency in the verdicts." *Buehl,* 166 F.3d at 179. Although the mens rea requirement for each of these degrees of homicide differ, "the Pennsylvania Criminal Code generally follows the Model Penal Code rule that a lesser mens rea may be satisfied by proof of a greater one." *Id. See* 18 Pa. Cons. Stat. Ann. § 302(e) (West 1998); Model Penal Code § 2.02(5) (1985).

 In ruling on petitioner's PCRA application, the Pennsylvania Supreme Court analyzed the facts of the case and petitioner's claim that the three murder convictions are mutually inconsistent as follows:

> Consistency in verdicts is not required where there is evidence to support each verdict.... Given the facts of this case and the charges presented, sufficient evidence was established to sustain the verdicts of first, second and third degree murder. The evidence presented at trial established that the victim was removed to a wooded location against his will where he was brutally beaten, slashed and stabbed repeatedly.... The evidence establishes, beyond a reasonable doubt, that the killing occurred with malice, during the commission of a felony—kidnapping—and with the specific intent to bring about the death of the victim.

*Laird,* 555 Pa. at 648, 726 A.2d at 355 (citation omitted). The case cited by the Pennsylvania Supreme Court in support of its conclusion that consistency in verdicts is not required identifies both state and federal precedent for the proposition. This Court concludes that the state court did not apply this rule in a manner that was contrary to, or an unreasonable application of, federal law as established by the United States Supreme Court and that this claim does not provide a ground for federal habeas relief. *See Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d) (Supp. V 1999).

 Even if the Court were to assume *arguendo* that inconsistent verdicts present a problem of constitutional proportions, petitioner would not be entitled to relief. Under the AEDPA, a writ of habeas corpus shall not be granted unless the state adjudication of petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, [1] clearly established Federal law, [2] as determined by the Supreme Court of the United States...." 28 U.S.C. § 2254(d)(1). As discussed *supra,* the rule regarding mutually inconsistent verdicts is not clearly established, and was certainly not clearly established when petitioner's conviction became final. *Cf. Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (holding that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced"). *See also Williams v. Taylor,* 529 U.S. at 380, 120 S.Ct. 1495 ("It is perfectly clear that AEDPA codifies *Teague* to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final.").

In addition, the question presented by this claim has not been "determined by the Supreme Court of the United States." 28

U.S.C. § 2254(d)(1). Rather, the *Powell* Court left the question unanswered. *See Powell,* 469 U.S. at 69 n. 8, 105 S.Ct. 471. In *Williams v. Taylor,* the Supreme Court expressly agreed with the Seventh Circuit's conclusion that the AEDPA's "determined by the Supreme Court of the United States" clause " 'extends the principle of *Teague* by limiting the source of doctrine on which a federal court may rely in addressing the application for a writ.' " *Williams,* 529 U.S. at 381, 120 S.Ct. 1495 (quoting *Lindh v. Murphy,* 96 F.3d 856, 869 (7th Cir.1996)). Thus, for this additional reason, petitioner's claim regarding inconsistent jury verdicts does not present a claim upon which habeas relief can be granted.

### b. Polling Each Juror Individually as to Each Count and Each Defendant

Petitioner's next claim is that due to the trial court's failure to poll the jury about its verdict with respect to each defendant and each charge, he was deprived of his fundamental right to determine whether the jury verdict reflected the conscience of each of the jurors. To be clear, the trial court did poll the jury and each juror affirmed the verdicts read by the jury foreman. Trial Tr. at 728–31 (May 20, 1988). Petitioner's argument is styled as both a due process violation and an ineffective assistance claim. In essence, he avers that (1) the trial court's failure to poll each juror individually with respect to each defendant and each count of the indictment constitutes *per se* reversible error and warrants the grant of a new trial; (2) trial counsel was ineffective for failing to demand such a poll; and (3) appellate counsel was ineffective for failing to raise this error on direct appeal. Respondents answer by asserting that petitioner's claim does not present a federal constitutional issue and that the question of jury polling is strictly a matter of state law. Respondents further argue that counsel cannot be deemed ineffective for failing to raise a meritless claim.

During PCRA review, the Pennsylvania Supreme Court concluded that this claim did not warrant relief as a matter of Pennsylvania law. *Laird,* 555 Pa. at 649, 726 A.2d at 355. In addition, the United States Supreme Court has never recognized a constitutional right to have a jury polled; its rulings in this area have been limited to analyzing whether posing certain questions to a jury can be coercive. *See, e.g., Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Given that the federal courts have not enunciated a clear standard on this issue, this Court concludes that the state adjudication of the claim did not result in a decision that was contrary to, or an unreasonable application of, federal law as established by the Supreme Court.

Finally, the Court rejects petitioner's argument that trial and appellate counsel were ineffective for failing to raise this issue. As the Pennsylvania Supreme Court correctly observed, "[c]ounsel cannot be ineffective for failing to raise a meritless claim." *Laird,* 555 Pa. at 649, 726 A.2d at 355. *See generally Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, the Court concludes that petitioner's claim regarding inconsistent jury verdicts and the trial court's failure to poll each juror regarding their verdict on each count with respect to each defendant (Claim XIV) does not constitute a basis for federal habeas relief.

### 6. Constitutionality of Reasonable Doubt Instruction

Petitioner asserts that he should be afforded a new trial because the reasonable doubt instruction given at trial was in vio-

lation of due process and the Eighth Amendment; he argues that the charge relaxed the standard of proof such that the Commonwealth did not have to meet its burden beyond a reasonable doubt (Claim XV). Respondents contend that this claim is procedurally defaulted because the PCRA court stated the issue was waived.

On PCRA review, the Pennsylvania Supreme Court, citing *Albrecht*, wrote that "[a] claim for post-conviction relief cannot be raised for the first time on appeal to this court." *Laird*, 555 Pa. at 646, 726 A.2d at 354. The court went on to explain that the pre-*Albrecht* relaxed waiver rule would not apply in petitioner's case. As discussed *supra* Part III(C)(2), at the time petitioner filed his direct appeal and PCRA petition, the Pennsylvania courts were still employing a relaxed waiver rule in capital cases whereby claims raised during PCRA review could be reached regardless of waiver. Additionally, as discussed *supra*, an unsettled state procedural rule does not serve as a bar to federal habeas review. Since the claim was presented to the Pennsylvania Supreme Court on PCRA review and rejected, the Court concludes that petitioner has fully exhausted this claim as there is no further state remedy available to petitioner and that the claim is not procedurally defaulted. *See supra* Part III; 28 U.S.C. § 2254(b)(1)(B)(i), (d). Pre–AEDPA independent judgment in analyzing the claim is appropriate as it was not adjudicated on the merits by the state court. *See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.2001).

■ The United States Constitution does not dictate the manner in which a criminal jury be instructed regarding the government's burden of proof so long as the jury instructions, taken as a whole, correctly convey the concept of reasonable doubt to the jury. *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). Provided that the trial court instructs the jury on the necessity of finding guilt beyond a reasonable doubt, the federal Constitution does not require that particular words be used in advising a jury of the prosecution's burden of proof.

At trial, the court's reasonable doubt instruction to the jury was as follows:

Now, Members of the Jury, although the Commonwealth has the burden of proving that the defendant is guilty beyond a reasonable doubt, this does not mean the Commonwealth must prove its case beyond all doubt and to a mathematical certainty nor must the Commonwealth demonstrate the complete impossibility of innocence.

What then do we mean by a reasonable doubt. A reasonable doubt is a doubt that would restrain a reasonably careful and sensible person from acting upon a matter of importance in his or her own affairs.

A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime

A reasonable doubt must be a real doubt. It may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.

Trial Tr. at 654–55 (May 19, 1988).

Petitioner's contention with respect to this portion of the jury charge rests on an interesting linguistic argument: he avers that the trial court's instruction that reasonable doubt is a doubt that would cause a person to *restrain* from acting requires a degree of doubt that would stop a person from acting at all, whereas an instruction that reasonable doubt is a doubt that would cause a person to *hesitate* before acting would merely cause a person to

pause before acting.[14] Petitioner argues that the trial court's use of the word "restrain" thus imposed a significantly lighter burden of proof than due process allows.

■ The United States Supreme Court has clearly stated that in cases where a reasonable doubt instruction is at issue, the constitutional question "is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor*, 511 U.S. at 6, 114 S.Ct. 1239.[15] *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The inquiry is not, then, whether a particular word or phrase is used, but rather, when "'taken as a whole, the instructions [must] correctly convey[y] the concept of reasonable doubt to the jury.'" *Id.* at 5, 114 S.Ct. 1239 (modifications in original) (quoting *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954)).

■ In the instruction given at petitioner's trial, the trial court properly emphasized to the jury that a defendant's guilt must be proved beyond a reasonable doubt, focusing on the reasonableness of such doubt. In *Starkes v. Marks*, 524 F.Supp. 37 (E.D.Pa.1981), a court in this district concluded that due process does

not mandate which of two Pennsylvania jury instructions, one using the word "restrain," and one using the word "hesitate," be used. As the *Starkes* court explained, "[a]lthough there may be a semantic difference between the terms 'restrain' and 'hesitate' when viewed in isolation, it cannot be said ... that there is a substantial difference between these two charges when each term is viewed in the context of the overall charge." *Id.* at 40. *See generally Commonwealth v. Cartagena*, 482 Pa. 6, 26, 393 A.2d 350, 360 (1978) (observing that the "restrain" charge has been "sanctioned time and again" by the Pennsylvania Supreme Court; citing cases). This Court concludes that the trial court's use of the word "restrain" as opposed to "hesitate" did not impermissibly lower the government's burden of proof and that this claim (Claim XV) does not warrant habeas relief.

### 7. *Sufficiency of the Evidence Needed to Establish Kidnapping*

As set forth *supra* Part II, petitioner and his co-defendant were charged and convicted of kidnapping Milano, in addition to a number of other offenses. Petitioner contends that there was insufficient evidence to establish kidnapping; he claims

---

**14.** The Court notes that the Pennsylvania model charge on reasonable doubt now, and at the time of Laird's trial, provides as follows:

Although the Commonwealth has the burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect

to some element of the crime. A reasonable doubt must be a real doubt; it may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.

Pennsylvania Criminal Suggested Standard Jury Instructions § 7.01(3) (last revised June 1975).

**15.** In *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), for example, the Supreme Court found a charge impermissible when the jury was told, *inter alia*, that a reasonable doubt is "substantial" or "doubt as would give rise to a grave uncertainty." *Id.* at 40–41, 111 S.Ct. 328.

violations of the Fifth, Sixth, Eighth and Fourteenth Amendments (Claim XVI). On this basis, he requests relief from both his kidnapping conviction and his death sentence as the kidnapping was used to establish the aggravating circumstance of killing in the perpetration of a felony. Respondents assert that this claim is procedurally defaulted as it was never presented to the state courts as a federal constitutional issue.

By way of background, the jury was instructed at trial that the prosecutor had to prove the following elements beyond a reasonable doubt in order to find the defendants guilty of kidnapping: (1) that defendant, an accomplice of the defendant, or a co-conspirator "removed Anthony Milano a substantial distance under the circumstances from the place where he was found"; (2) that defendant, an accomplice of the defendant, or a co-conspirator "accomplished that removal either by force or by threat or by deception"; and (3) that the removal was accomplished "with the intention to inflict bodily injury on or terrorize Mr. Milano." Trial Tr. at 670 (May 19, 1988). *See* 18 Pa. Cons.Stat. Ann. § 2901. During the penalty phase, the jury was further instructed that if the jury "find[s] beyond a reasonable doubt that the defendant committed a killing while in the perpetration of the felony of kidnaping, then that will be a finding of one aggravating circumstance." Trial Tr. at 797 (May 20, 1988). *See* 42 Pa. Cons.Stat. Ann. § 9711(d)(6) (defining "killing while in the perpetration of a felony" as an aggravating circumstance).

Petitioner argues that there was insufficient evidence of kidnapping because there was no evidence of removal by the petitioner and no evidence of force or deception. Respondents contend that this Court must defer to the state court's determination as to the sufficiency of the evidence of kidnapping under Pennsylvania state law. On direct review, petitioner presented the issue as one of state evidence law, citing exclusively to state cases interpreting the burden of proof required by the Pennsylvania Criminal Code.

On direct review, the Pennsylvania Supreme Court concluded that under Pennsylvania law:

> First ... kidnapping can be established by proof of either removal or a substantial period of isolated confinement; proof of both is not necessary. Secondly, the substantial distance requirement is to be evaluated "under the circumstances." The circumstances of Anthony Milano's departure with appellants were that he believed he was taking the two men to their respective homes. His body was found in a wooded area a substantial distance from the Edgely Inn. Clearly, under these circumstances, the Commonwealth has sustained its burden.

*Chester,* 526 Pa. at 608–09, 587 A.2d at 1382. Petitioner did not pursue this claim on PCRA review. As discussed *supra* Part III(A)(1), to satisfy the exhaustion requirement of 28 U.S.C. § 2254, a petitioner must normally present a federal claim's factual and legal basis in a way that puts the state courts on notice that a federal claim is being asserted.

The Court concludes, however, that this claim was automatically exhausted by the Pennsylvania Supreme Court's mandatory review, which, now and at the time of petitioner's conviction, required the state supreme court to conduct an examination of whether "the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." *See* 42 Pa. Cons.Stat. Ann. § 9711(h)(3)(ii) (West 1982 & Supp.1991) (last amended Dec. 22, 1989). In this case, the jury found two aggravating circumstances, that

"the defendant committed the killing while in the perpetration of a felony, [42 Pa. Cons.Stat. Ann. § 9711(d)(6),] and (d)(8) the offense was committed by means of torture." *Laird,* 555 Pa. at 636 n. 2, 726 A.2d at 349 n. 2. As the Pennsylvania Supreme Court is required to conduct an automatic inquiry into the evidentiary sufficiency of a jury's findings of aggravating circumstances, the Court determines that the claim was fairly presented to the Pennsylvania Supreme Court on direct review and exhausted; it is not procedurally defaulted.[16] It does not, however, provide a basis for federal habeas relief.

 Sufficient evidence was presented at trial for a reasonable juror to conclude that petitioner and Chester removed the decedent a substantial distance under the circumstances and/or that they deceived Milano in departing with him from the Edgely Inn, kidnapping him within the meaning of the statute. As a general matter, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Furthermore, in a fact-specific inquiry such as this one, a federal habeas court will not disturb the Pennsylvania Supreme Court's finding unless it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). With respect to the question of whether the prosecution presented evidence sufficient to establish kidnapping, the Court concludes that the Pennsylvania Supreme Court's determination of the facts was rea-

sonable; this claim (Claim XVI) does not provide a ground for federal habeas relief.

### 8. *The Admission of a Statement Petitioner Made During Trial*

Petitioner argues that his Fifth, Sixth and Fourteenth Amendment rights were violated when the trial court admitted a statement allegedly made by petitioner to Constable Elwood Riley, Jr. ("Constable Riley") (Claim XVII). During trial, Constable Riley asked petitioner if it was true that his lawyer wanted him to wear a bulletproof vest. Petitioner responded in the affirmative, adding that there was a contract taken out on him by the "gay lib people" and that "those people are fucking crazy." The trial court admitted this statement at trial through the testimony of Detective Frank Dykes. *See* Trial Tr. at 442 (May 18, 1988).

Petitioner characterizes the above exchange as an in-custody interrogation without his attorney present and he argues that the trial court's admission of this statement violated his Fifth Amendment *Miranda* rights. Initially, the Court must determine whether this claim was procedurally defaulted as respondents contend. In his brief on direct appeal, petitioner presented this claim as a federal issue, quoting from *Miranda* at length; the Pennsylvania Supreme Court examined the claim on federal constitutional grounds on direct review. Accordingly, the Court concludes that this claim was exhausted and is not procedurally defaulted.

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the prosecution cannot use statements

---

**16.** In the alternative, the Court concludes that this claim is exhausted as petitioner has no further state recourse. *See* 28 U.S.C. § 2254(b)(1)(B)(i) (Supp. V 1999). The Pennsylvania Supreme Court would undoubtedly reject the federal claim as waived under *Albrecht* and thus procedurally defaulted or reject the claim as previously litigated as a state law issue on direct appeal.

"stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *See also Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (reaffirming *Miranda*). The Supreme Court explained in *Miranda* that custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. It is axiomatic that a defendant being held in custody is thus protected by the rights recognized by the United States Supreme Court in *Miranda. See Mathis v. United States,* 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968); *United States v. Morales,* 834 F.2d 35, 39–40 (2d Cir.1987) (Oakes J., concurring).

On direct review, the Pennsylvania Supreme Court acknowledged as undisputed that Laird was in custody at the time the statement was made. However, the court wrote that petitioner "has not satisfied the custodial interrogation requirement for the exclusion of the statement in question. 'Interrogation' has been defined as 'any question likely to or expected to elicit a confession.'" *Chester,* 526 Pa. at 598, 587 A.2d at 1377 (quoting *Commonwealth v. Simala,* 434 Pa. 219, 227, 252 A.2d 575, 579 (1969)). As explained by the United States Supreme Court, interrogation consists of direct questioning by law enforcement officers, *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, or its "functional equivalent." *Arizona v. Mauro,* 481 U.S. 520, 526, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). In *Innis,* the Supreme Court defined the phrase "functional equivalent" as "any words or actions on the part of the police (other than those normally attend-ant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response...." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682 (footnotes omitted). As the *Innis* Court explained, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301–02, 100 S.Ct. 1682 (emphasis in original).

██ In this case, Constable Riley asked petitioner whether his attorney wanted him to wear a bulletproof vest. That question could not have been reasonably expected to elicit an inculpatory statement. Constable Riley's inquiry was simply a security-related question made in the ordinary course of the administration of justice. *See generally Pennsylvania v. Muniz,* 496 U.S. 582, 605, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (discussing administrative questioning, i.e., questioning that is necessarily attendant to legitimate police procedure, that falls outside *Miranda*'s protection, such as the "routine booking question" exception).

During trial, petitioner's incriminating statement was not an answer to a question that was likely to elicit an incriminating response. This Court thus determines that the state court did not apply the law in a way that is contrary to, or an unreasonable application of, United States Supreme Court precedent, and this claim (Claim XVII) does not warrant habeas relief.

### 9. Severance

Petitioner claims that the trial court's failure to sever his trial from that of his co-defendant resulted in a constitutionally

infirm conviction in violation of his right to a fair trial (Claim XVIII). Petitioner's argument is based on the claim that he and his co-defendant presented antagonistic defenses. Respondents contend that this claim is procedurally defaulted and that the trial court's decision not to sever the trials was proper.

Respondents' procedural default argument is based on their conclusion that this claim was never presented to the state courts as a federal constitutional issue. On direct appeal, petitioner presented it as a state law issue, not as a federal constitutional issue,[17] Br. for Appellant at 26–29 (July 19, 1989), and the claim was not presented at all during PCRA review. Despite not presenting it as a federal issue to the state courts, the Court concludes that this claim is exhausted as it would undoubtedly be rejected on PCRA review as previously litigated.[18] However, the claim is procedurally defaulted and this Court "may not consider the merits of [the] claim[ ] unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default." *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir.1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The Court concludes that he has not done so.[19]

■ The Supreme Court has noted that "[i]mproper joinder does not, by itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). As explained by the Tenth Circuit, "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial." *Cummings v. Evans*, 161 F.3d 610, 619 (10th Cir.1998), *cert. denied*, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999). *See also Jenner v. Class*, 79 F.3d 736, 741 (8th Cir.1996) (holding that habeas relief based on the trial court's failure to grant severance is only appropriate where petitioner "can establish that the failure to grant severance rendered his trial fundamentally unfair"); *Lewis v. Huch*, 964 F.2d 670, 676 (7th Cir.1992) (writing that failure to sever will only warrant habeas relief where the trial court's refusal to grant severance was an abuse of the trial court's discretion and that this abuse resulted in a trial that was fundamentally unfair).

■ Fundamental unfairness can be shown where the defenses presented by two defendants are truly "mutually exclusive, such that the jury could not believe the core of one defense without discount-

---

17. Although petitioner did cite one federal case in support of this claim in his state court brief, *United States v. Haldeman*, 559 F.2d 31, 71 (D.C.Cir.1976), the case analyzed the doctrine of severance for inconsistent defenses under Federal Rule of Criminal Procedure 14; it did not employ constitutional analysis on this issue.

18. In the alternative, the Pennsylvania Supreme Court would undoubtedly reject the federal claim as waived and thus defaulted under the procedural rule announced in *Albrecht*.

19. Petitioner contends that this claim is not procedurally defaulted, arguing that the Pennsylvania Supreme Court was required to review this claim pursuant to 42 Pa. Cons.Stat. Ann. § 9711(h). The Court concludes that the trial court's failure to sever the criminal trials in this case is not a claim that was automatically exhausted by virtue of the Pennsylvania Supreme Court's mandatory appellate review as it is not a fundamental constitutional error that implicates one of the enumerated grounds for relief as discussed *infra*.

ing entirely the core of the other." *United States v. Dirden*, 38 F.3d 1131, 1141 (10th Cir.1994). Co-defendants' attempts to cast blame on one another are, as a general rule, insufficient. *See id.; Hood v. Helling*, 141 F.3d 892, 897 (8th Cir.1998) ("Accusations between codefendants at a joint trial and the admission of evidence by one party that is harmful to the other do not necessarily make a trial fundamentally unfair."); *cf. Zafiro v. United States*, 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (holding that mutually antagonistic defenses are not prejudicial *per se*, so as to require severance); *United States v. Tootick*, 952 F.2d 1078 (9th Cir.1991) (concluding that mutually exclusive claims do not create a *per se* right that trials be severed).

At petitioner's trial, "[n]either Chester nor Laird denied involvement in the killing of Anthony Milano. Rather each man claimed that the other had slashed Milano's throat." *Chester*, 526 Pa. at 590, 587 A.2d at 1373 (citing Trial Tr. at 480 (May 18, 1988)). On direct appeal, the Pennsylvania Supreme Court, citing *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir.1981), concluded that these defenses did not rise to the level of antagonism that requires severance. *Id.*[20]

■ On direct review of petitioner's conviction, the Pennsylvania Supreme Court analyzed the potential for prejudice that could have resulted from petitioner and Chester being tried together and determined that the potential for prejudice

was not so great that severance was required. The Pennsylvania Supreme Court concluded as follows:

> Defenses become antagonistic only when the jury, in order to believe the essence of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony of his co-defendant.... In this case the jury was not faced with such a dilemma. Both men conceded their participation in the killing and disputed only their respective acts in furtherance thereof.

*Chester*, 526 Pa. at 590–91, 587 A.2d at 1373 (citation omitted). Given that a petitioner claiming improper joinder must demonstrate that the trial court's failure to sever resulted in a trial that was fundamentally unfair, this Court concludes that the Pennsylvania Supreme Court's approval of the trial court's refusal to sever the trials did not result in a decision that was contrary to, or involved an unreasonable application of, federal law as established by the Supreme Court of the United States. Thus, Laird cannot establish prejudice or a fundamental miscarriage of justice and this claim (Claim XVIII), that the trial court improperly refused to sever his trial from Chester's, is procedurally defaulted and may not be reached by this Court.

### 10. Exculpatory Evidence

Petitioner's final guilt phase claim is that he was improperly precluded from presenting exculpatory evidence (Claim

---

**20.** *See Berkowitz*, 662 F.2d at 1134 ("[W]e hold that the defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.").

The United States Supreme Court later held in *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), that mutually antagonistic defenses are not prejudicial *per se*, so as to require severance. *Id.* at 538, 113 S.Ct. 933. The *Zafiro* Court's holding did not address the question of when severance is constitutionally required; rather, the *Berkowitz* and *Zafiro* holdings were based on Rule 14 of the Federal Rules of Criminal Procedure.

XIX) in violation of the Sixth, Eighth and Fourteenth Amendments. Prior to trial, petitioner moved to introduce evidence that his co-defendant, Chester, refused to answer the question whether he had killed Milano during a pre-trial polygraph examination. *See* Pre-trial H'rg Tr. I–153–54, I–156 (May 9, 1988). Because the prosecution informed Laird's counsel that it planned to introduce the evidence, Laird's motion was withdrawn. Chester's counsel, however, objected to the admissibility of the evidence on the ground that it violated Chester's Fifth Amendment right against self incrimination. Although Chester testified at trial that Laird had committed the murder, the trial court sustained Chester's objection to the introduction of the evidence that he had refused to answer the question whether he had killed Milano.

Respondents first argue that this claim is procedurally defaulted. In addition, respondents argue that the admissibility of evidence at trial is a matter of state evidence law, not a ground for federal habeas relief, and that petitioner did not suffer prejudice of a constitutional dimension as a result of the state court's ruling. It is petitioner's contention that he does not seek to admit evidence of polygraph results, but only evidence that the question was asked and that Chester refused to answer. Petitioner also contends that the trial court's exclusion of this evidence constituted a denial of his Sixth Amendment right to cross-examination and a deprivation of his right to defend himself against the state's accusations.

In his brief on direct appeal, Laird presented this claim to the Pennsylvania Supreme Court as a question of state law, citing one Pennsylvania case concerning state law issues, *Commonwealth v. Scott,* 480 Pa. 50, 389 A.2d 79 (1978). Br. for Appellant at 45 (July 19, 1989). The state Supreme Court was thus not on notice that a federal claim was being asserted. *See supra* Part III(A)(1). On direct review, the Pennsylvania Supreme Court treated the issue as an evidentiary claim, writing that "[t]his Court has repeatedly and consistently held that results of a polygraph examination are inadmissible for any purpose." *Chester,* 526 Pa. at 597, 587 A.2d at 1376. The issue was not presented in Laird's PCRA petition. Notwithstanding this fact, the Court determines that this claim is exhausted as it would have been deemed previously litigated had it been presented on PCRA appeal. Because the claim was never fairly presented as a federal issue, however, the Court concludes that the claim is procedurally defaulted and may not be reached absent a showing of cause and prejudice or a fundamental miscarriage of justice.[21]

Petitioner cannot establish prejudice or a miscarriage of justice with respect to this issue. As a general rule, evidentiary errors made by the state court are not considered to be of constitutional proportions, such that they are cognizable in a federal habeas proceeding, unless the error deprives the defendant of fundamental fairness in his criminal trial. *See Sims v. Singletary,* 155 F.3d 1297, 1312 (11th Cir.1998) ("We will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the funda-

21. Petitioner contends that this claim is not procedurally defaulted, arguing that the Pennsylvania Supreme Court was required to review this claim pursuant to 42 Pa. Cons.Stat. Ann. § 9711(h). The Court concludes that the trial court's refusal to admit certain potentially exculpatory evidence in this case is not a claim that was automatically exhausted by virtue of the Pennsylvania Supreme Court's mandatory appellate review as it is not a fundamental constitutional error that implicates one of the enumerated grounds for relief as discussed *infra.*

mental fairness of the trial."), *reh'g denied,* 163 F.3d 1362 (11th Cir.1998), *cert. denied,* 527 U.S. 1025, 119 S.Ct. 2373, 144 L.Ed.2d 777 (1999); *Bisaccia v. Attorney General,* 623 F.2d 307, 312 (3d Cir.1980). In this case, any error made by the trial court in refusing to allow petitioner to challenge Chester's credibility did not deprive petitioner of fundamental fairness. Chester's testimony was no doubt important to the state's case against Laird, but the Commonwealth introduced a wealth of other evidence, including petitioner's admission that he was at the scene of the murder. In light of all of the evidence presented at trial, the Court concludes that not allowing petitioner the opportunity to cross examine Chester with respect to Chester's refusal to answer the question whether he had killed Milano did not deny petitioner fundamental fairness at trial. Thus, petitioner is unable to establish any prejudice or a fundamental miscarriage of justice with respect to this claim (Claim XIX) and the Court may not reach it as it is procedurally defaulted.

## B. Penalty Phase Claims

### 1. Shackling During the Penalty Phase

■ Petitioner claims that his right to a fair and reliable capital sentencing was violated when he was forced to wear visible shackles and handcuffs in front of the jury and that his trial counsel was ineffective for failing to object to the error (Claim II). Respondents contend that this claim is procedurally defaulted, arguing that it was not fairly presented to the Pennsylvania state courts and that petitioner did not suffer any prejudice with respect to this issue.

The Court finds as an initial matter that this claim is not procedurally defaulted—petitioner fairly presented this claim to the state courts on direct appeal, citing *Hol-*

*brook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), and *Elledge v. Dugger,* 823 F.2d 1439 (per curiam), *modified,* 833 F.2d 250 (per curiam) (11th Cir. 1987), and in his PCRA petition. As petitioner cited relevant federal case law that employs constitutional analysis on this issue, the state courts had ample "notice that a federal claim [was] being asserted," *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir.1999), and petitioner gave the state courts a fair opportunity to address this claim.

During the penalty phase of their trial, as set forth in petitioner's brief filed in support of his direct appeal, "both defendants [Laird and Chester] were restrained in leg shackles and their handcuffed wrists were attached to a wide leather belt fastened around their midsections. Three to four armed and uniformed deputies were stationed in the front portion of the courtroom; a similar number were stationed in the rear." Br. for Appellant at 36–37 (July 19, 1989).

These security measures were adopted by the trial court and security personnel without any input from counsel or any inquiry into whether other means of security would be effective. As explained by petitioner's trial counsel:

Prior to the penalty phase, I was approached by a white-shirted deputy sheriff who informed me that he had met with the Judge and discussed security precautions with him. He informed me that both defendants would remain handcuffed and shackled during the penalty phase of the trial. He said that he had discussed it with the Judge and there was nothing more to be said about it, that he was handling all security measures and these precautions had been approved by the trial court. The defendants remained in this condition throughout the remainder of the trial.

Aff. of Ronald H. Elgart, Esq. (Aug. 10, 1988) (Ex. 1 *in* Document 18, filed Dec. 23, 1999).

On direct appeal, the Pennsylvania Supreme Court concluded that this claim did not entitle petitioner to relief. The Pennsylvania Supreme Court acknowledged that viewing petitioner in handcuffs and shackles "during the penalty phase could have the effect of creating in the minds of the jurors the presumption that the defendant is dangerous and therefore worthy of the death sentence." *Chester,* 526 Pa. at 601, 587 A.2d at 1378–79. Despite this, the court concluded that the trial court has the responsibility and authority to maintain order in the courtroom and that "[t]he trial judge in the instant matter apparently believed, in his discretion, that restraint of the defendants was necessary for the security of the courtroom." *Id.* at 602, 587 A.2d at 1379. In that connection, the state court concluded that "[s]ince trial counsel did not object at that point [when defendants were restrained], we can assume only that the judge's belief was justified," *id.,* and that "[h]ad trial counsel objected the judge would have had an opportunity to place on the record his reasons for restraining the defendants." *Id.* at 602 n. 7, 587 A.2d at 1379 n. 7. On PCRA review, the Pennsylvania Supreme Court did not reach the issue, concluding that it had been "finally litigated" and thus not a potential ground for PCRA relief.[22] *See* 42 Pa. Cons.Stat. Ann. § 9544(a)(2); *supra* Part III(C)(3).

In its disposition of this issue, the Pennsylvania Supreme Court cited two state cases, *Commonwealth v. Patterson,* 452 Pa. 457, 308 A.2d 90 (1973), and *Commonwealth v. Africa,* 466 Pa. 603, 353 A.2d 855

(1976), which employed federal constitutional analysis, citing *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), and other relevant case law on the issue of shackling. The Court thus concludes that the Pennsylvania Supreme Court adjudicated this claim on the merits and that this Court's review of the claim is limited to the deferential review appropriate under the AEDPA.

The United States Supreme Court has written that practices such as shackling and other overt displays of security are inherently prejudicial and "should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (concluding that defendant was not deprived of his right to a fair trial by virtue of the fact that the customary court security was supplemented by four uniformed officers sitting in the front row of the spectator section of the courtroom). The Supreme Court explained the risks inherent in shackling a defendant in *Illinois v. Allen,* 397 U.S. at 344, 90 S.Ct. 1057, as follows:

> Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.

Although the Third Circuit has not addressed the question of whether the Constitution places limitations on restraining defendants during capital sentencing, many courts that have addressed the issue have concluded that shackling may be so inherently prejudicial that it jeopardizes a

---

**22.** As set forth *supra,* this does not serve as a bar to federal habeas relief as "a petitioner who has raised the claim on direct appeal need not raise it again in a state post-conviction proceeding" in order to satisfy the federal exhaustion requirement. *Evans v. Court of Common Pleas,* 959 F.2d 1227, 1230 (3d Cir. 1992).

defendant's right to a fair capital sentencing proceeding. In *Elledge*, 823 F.2d at 1450–51, for example, the Eleventh Circuit set aside a state-imposed death sentence due to the fact that the petitioner had been seen in shackles by the jury. Basing its decision on the rationale set forth by the Supreme Court in *Holbrook*, the *Elledge* court wrote that shackling must be subject to "close judicial scrutiny, to determine if there was an essential state interest furthered, by compelling a defendant to wear shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed." *Elledge*, 823 F.2d at 1451–52 (internal citations and quotations omitted). Thus, in order to justify shackling, the state must make a showing that it is necessary to further an essential state interest. *See Holbrook*, 475 U.S. at 568–69, 106 S.Ct. 1340; *Elledge*, 823 F.2d at 1451–52. *See also Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir.1999) ("Due process was denied when the trial court ordered [the defendant] shackled ... without a proper determination of the need for shackles."); *Duckett v. Godinez*, 67 F.3d 734, 747 (9th Cir.1995) ("[W]e hold that shackling a defendant during a sentencing hearing before a jury is an inherently prejudicial practice which comports with due process only when used as a last resort to protect an essential state interest—such as maintaining public safety or assuring the decorum of the proceedings."); *Roche v. Anderson*, 132 F.Supp.2d 688 (N.D.Ind. 2001) (granting habeas relief on ground that petitioner was impermissibly shackled during the guilt and penalty phases of his trial).

The decision to shackle the defendants during the penalty phase was made *ex parte* without a hearing and without any inquiry into whether such extreme measures were necessary or whether less restrictive, less prejudicial, security mea-

sures could have been employed. Moreover, the trial judge did not make any findings on the record as to why petitioner and his co-defendant were shackled. *See Elledge*, 823 F.2d at 1451; *Commonwealth v. Jasper*, 531 Pa. 1, 12, 610 A.2d 949, 955 (1992) (observing that it is "well-settled under common law and constitutionally as incident to a fair trial without prejudice that defendants appear free from shackles or other physical restraints" during penalty phase; concluding that the trial court took proper measures to ensure that the jury could not see defendant shackled by inspecting the sight lines from the jury box); *see also Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994) (approving the use of shackles where the trial judge "went to the jury box and from various vantage points concluded that jurors would be unable to see appellant's feet clearly and would not see the shackles unless looking for them").

On direct appeal, the Pennsylvania Supreme Court observed that shackling petitioner during the penalty phase could have created the presumption in the minds of the jurors that petitioner was dangerous and worthy of the death sentence. *Chester*, 526 Pa. at 601, 587 A.2d at 1378–79. This risk is ever-present in a death penalty case and the trial court must take precautions to ensure that the security measures utilized at trial do not prejudice a defendant in the eyes of the sentencing jury. As the trial court in this case took no such precautions and shackling does not constitute harmless error, the Court concludes that the Pennsylvania Supreme Court's conclusion on this issue results in a decision that is an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.

In so holding, the Court is mindful that the AEDPA restricts "the source of clearly established law to [the Supreme Court's] jurisprudence." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Despite that the *Holbrook* Court did not squarely examine the constitutionality of conspicuous security during penalty proceedings, as the Eleventh Circuit noted in *Elledge*, "[n]othing in *Holbrook* indicates that the Supreme Court did not intend its ruling to apply to the penalty phase of a capital case [in addition to the guilt phase]; furthermore, it is unreasonable to believe that the court made its rule in *Holbrook* unaware that capital case trials are bifurcated. We think *Holbrook* means what it says." *Elledge*, 823 F.2d at 1451 n. 22. As discussed above, the *Holbrook* Court observed that shackling is an inherently prejudicial practice that should be permitted only when justified by an essential state interest. *Holbrook*, 475 U.S. at 568–69, 106 S.Ct. 1340. Accordingly, the Court concludes that the state supreme court's deference to the trial court's use of security's measures in this case was an unreasonable application of clearly established federal law as the Pennsylvania Supreme Court "unreasonably refuse[d] to extend the governing legal principle to a context in which the principle should control...." *Hardcastle v. Horn*, 2001 WL 722781, at *5 (E.D.Pa. June 27, 2001) (citing *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000)).[23]

Having determined that the Pennsylvania Supreme Court unreasonably declined to apply the *Holbrook* rule to the facts of

petitioner's case, petitioner is entitled to relief on this claim (Claim II). Petitioner's death sentence shall be set aside without prejudice to the right of the Commonwealth of Pennsylvania to conduct a new capital sentencing hearing should petitioner be retried for first degree murder (*see supra* Part IV(A)(2)) and found guilty.

### 2. Jury Instructions on Mitigating Circumstances and Mills v. Maryland

Petitioner argues that the jury instruction given during the penalty phase of trial regarding the application of mitigating factors was improper as it suggested that the jury had to unanimously find a mitigating circumstance before it could give effect to that factor in its sentencing decision in violation of the Eighth and Fourteenth Amendments (Claim III). Petitioner also makes a related objection to another portion of the charge, contending that the jury charge on the relevant burdens of proof for aggravating and mitigating circumstances exacerbated the probability that the jury unconstitutionally applied the trial court's instructions on mitigating circumstances. Respondents contend that the jury charge on this issue was proper as it did not expressly state that the jury must be unanimous in finding a mitigating circumstance. Respondents also aver that the rule petitioner seeks to apply to this claim is new and cannot be applied to this case retroactively.

#### a. Mills v. Maryland and its Progeny

 "The Eighth Amendment requires that the jury be able to consider and give

---

**23.** Having concluded that petitioner is entitled to federal habeas relief on this claim, the Court declines to address petitioner's related contention that his trial counsel was ineffective for failing to object to the shackling during the penalty phase. *See generally Roche v. Anderson*, 132 F.Supp.2d 688, 704 (N.D.Ind.

2001) ("[Petitioner's] counsel's failure to object on the record to the use of shackles is a clear example of deficient performance. As the United States Supreme Court has specifically labeled the use of shackles as prejudicial in *Holbrook*, the existence of prejudice caused by the deficient performance is also clear.").

effect to all relevant mitigating evidence offered by [a defendant]." *Boyde v. California*, 494 U.S. 370, 377–78, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The United States Supreme Court made clear in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), that if jurors were improperly led to believe that they could not each individually consider certain mitigating circumstances because they had failed to agree unanimously as to the existence of that circumstance, then "some jurors were prevented from considering factors which may call for a less severe penalty." *Mills*, 486 U.S. at 376, 108 S.Ct. 1860 (internal quotation omitted). If a juror is thus prevented from considering the factors that call for a less severe penalty, the death sentence cannot stand. *Id.; see also McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) ("*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.... Under *Mills*, such consideration of mitigating evidence may not be foreclosed by one or more jurors' failure to find a mitigating circumstance....").

Subsequent to *Mills*, in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the Supreme Court observed that "[t]he legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is less than clear from our cases." *Id.* at 378, 110 S.Ct. 1190. To clarify what rule applies in a case where a jury instruction on the use of mitigating circumstances is ambiguous and thus subject to an erroneous interpretation, the Supreme Court held that the proper inquiry is whether there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally rele-

vant evidence." *Id.* at 380, 110 S.Ct. 1190. The *Boyde* Court explained its rationale as follows:

> Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction.

*Id.* The Pennsylvania Supreme Court, however, did not conduct this crucial inquiry in petitioner's case.

### b. The Pennsylvania Supreme Court Opinion

In its disposition of this issue on PCRA review, the Pennsylvania Supreme Court relied on its decision in *Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719 (1993), upon concluding that "[p]etitioner's argument is identical to the one reviewed by this court in *Hackett* . . . ." *Laird*, 555 Pa. at 657, 726 A.2d at 359. Relying on *Hackett*, the state supreme court found that the charge given at petitioner's trial was constitutional, declining to apply the Third Circuit's analysis in *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997), under *Teague*, and concluding that the charge and verdict slip were permissible under *Hackett*, *Mills* and *Zettlemoyer v. Fulcomer*, 923 F.2d 284 (3d Cir.1991). Writing that the charge merely mirrored the death penalty statute, the court concluded that collateral relief was not warranted. *See Laird*, 555 Pa. at 656–57, 726 A.2d at 359; 42 Pa. Cons.Stat. Ann. § 9711(c)(1)(iv) (West 1982 & Supp.1991) (last amended Dec. 22, 1989). The PCRA

court also wrote that "the instruction and verdict slip in this case mirror the words of the charge and verdict slip which the Third Circuit found not to violate *Mills*, in *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 306–07 (3d Cir.1991)." *Laird*, 555 Pa. at 657 n. 12, 726 A.2d at 359 n. 12.

The Pennsylvania Supreme Court's reliance on *Hackett* is problematic as that court failed to utilize the proper legal standard established by the Supreme Court in *Boyde*, resulting in a decision that was contrary to clearly established federal law. As explained by the federal district court that recently reviewed the Pennsylvania Supreme Court's disposition of the *Hackett* case:

> [T]he Court concludes that the state court relied solely on its prior decisions in *Frey* and its progeny, and thus failed to utilize the proper legal standard as dictated by the United States Supreme

Court in *Boyde*, which was clearly established federal law at the time that Petitioner's direct appeal was decided. Because the state court applied the incorrect legal standard (and thus performed the wrong legal inquiry), the decision of that court is contrary to clearly established federal law.

*Hackett v. Price*, 2001 WL 884721, at *21 (E.D.Pa. Aug.6, 2001). In addition, the Pennsylvania Supreme Court's reliance on *Zettlemoyer* was misplaced as the language of the charge given by the trial court in this case was quite different from the charge at issue in *Zettlemoyer*.[24] Finally, the Pennsylvania Supreme Court refused to apply *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997), concluding that it was a new rule within the meaning of *Teague* and that it was not bound by the decisions of the lower federal courts on collateral

---

**24.** The charge given in *Zettlemoyer* was substantially different than the charge given in petitioner's case. In *Zettlemoyer*, the trial court instructed the jury, in pertinent part, as follows:

> The verdict, of course, must be unanimous. Again, if you find unanimously, beyond a reasonable doubt, the aggravating circumstance that I have mentioned, the only one that's applicable, that the victim was a prosecution witness to a felony and it was committed and he was murdered so that he would not testify, that is an aggravating circumstance. If you find that aggravating circumstance and find no mitigating circumstances or if you find that the aggravating circumstance which I mentioned to you outweighs any mitigating circumstance you find, your verdict must be the death penalty. If, on the other hand, you find that the Commonwealth has not proven an aggravating circumstance beyond a reasonable doubt or if they have, that the mitigating circumstances outwieght (sic) the aggravating circumstances, then you must bring in a verdict of life imprisonment.
>
> . . . .
>
> . . . Under the law, as I said, you are obligated by your oath of office to fix the death

penalty at death if you unanimously agree and find beyond a reasonable doubt that there is an aggravating circumstances (sic) and either no mitigating circumstance or that the aggravating circumstance outweighs any mitigating circumstances.

*Zettlemoyer*, 923 F.2d at 307–08 (modifications in original). Although the charge in *Zettlemoyer* does not explicitly explain to the jury that each juror is free to consider mitigating circumstances, it separates the requirement of a unanimous verdict and a finding of mitigating circumstances in its initial explanation of the requirement that the jury find aggravating circumstances unanimously. As the Third Circuit explained, the charge required the jury's verdict to be unanimous; it did not require unanimity with respect to the jury's findings. *Id.* at 308. The charge given in petitioner's case does not differentiate between what is required of the jury with respect to its findings of aggravating circumstances and mitigating circumstances. Rather, there is a reasonable likelihood that the jury in petitioner's case understood the instruction that they be unanimous to apply to findings of both aggravating and mitigating circumstances.

review. *See Laird,* 555 Pa. at 657 n. 12, 726 A.2d at 359 n. 12.

Although the Pennsylvania Supreme Court stated that *Mills* established one of the rules controlling this case; it did not consider the standard of review established in *Boyde,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316, which requires an inquiry not contemplated by *Mills.* This Court concludes that the Pennsylvania Supreme Court's failure to apply the proper standard required by *Boyde,* a case that was decided prior to the date petitioner's conviction became final, resulted in a decision that is contrary to clearly established federal law as determined by the Supreme Court of the United States and that the AEDPA does not require deference to the Pennsylvania Supreme Court decision on this issue. This Court will review the claim de novo as it presents a question of law.

### c. Analysis and Conclusions

■ As discussed *supra* Part IV(A)(2)(b), in analyzing jury instructions, the Court must first focus on the specific language challenged and then consider the allegedly infirm language in the context of the jury charge as a whole. *See Smith v. Horn,* 120 F.3d 400, 411 (3d Cir.1997). The central inquiry is whether there is a reasonable likelihood that the jury applied the challenged instructions in a way that precludes the consideration of constitutionally relevant evidence. *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190.

The charge given in petitioner's case was worded almost identically to a charge found impermissible by the Third Circuit in *Frey,* 132 F.3d 916.[25] In that case, the Third Circuit analyzed *Boyde, Mills* and *McKoy* and held that the following charge was unconstitutional, concluding that it was reasonably likely that the jury would have understood the charge to require unanimity in consideration of mitigating evidence:

> Members of the jury, you must now decide whether this defendant should be sentenced to death or life imprisonment. The sentence will depend upon your findings concerning aggravating and mitigating circumstances. The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.
>
> . . . .
>
> Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstances (sic) and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circum-

**25.** Respondents contend that *Frey* does not apply in this case as habeas petitioners may not benefit from new rules of constitutional law that are announced after a conviction has become final. *See* 28 U.S.C. § 2254; *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The Court rejects this contention as the *Frey* court did not announce a new constitutional rule within the meaning of § 2254 and *Teague.* The *Frey* court's ruling was clearly based on *Boyde, Mills* and *McKoy,* all cases that were decided before petitioner's conviction and death sentence became final on October 7, 1991, the date the United States Supreme Court denied petitioner's application for a writ of certiorari on his direct appeal. *Laird v. Pennsylvania,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See Stringer v. Black,* 503 U.S. 222, 226, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) ("Petitioner's conviction became final when we denied certiorari...."); *Saffle v. Parks,* 494 U.S. 484, 486–87, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

stances. In all other cases, your verdict must be a sentence of life imprisonment. *Frey,* 132 F.3d at 922.

The relevant portions of the charge given in petitioner's case are virtually identical, as set forth below:

Members of the Jury, you must now decide whether each of these defendants is to be sentenced to death or life imprisonment. . . .

And that sentence will depend upon your findings concerning aggravating and mitigating circumstances. *Our Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.*

The verdict must be a sentence of life imprisonment in all other cases.

. . . .

Remember that your verdict must be unanimous. It cannot be reached by a majority vote or any percentage whatsoever. It must be the verdict of each and every one of you.

*Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance; or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances* in all other cases, your verdict must be a sentence of life imprisonment.

Trial Tr. at 796, 803 (May 20, 1988) (emphasis added).

There is a reasonable likelihood that the jury understood the charge given in petitioner's case to mean both that the jury must find the existence of a mitigating circumstance unanimously and that the jury must unanimously conclude that the aggravating circumstances outweigh any mitigating circumstances. In light of the clear requirements set forth in *Mills* whereby each juror must be permitted to consider mitigating factors individually, the instructions given by the trial court were improper.

There is also a reasonable likelihood that the wording of the penalty phase verdict slip compounded the error in the jury instructions on this issue. That verdict slip read as follows:

1. We the jury unanimously sentence the defendant to

☐ death

☐ life imprisonment

2. (To be used if the sentence is death)

We the jury have found unanimously

☐ at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s)(is)(are)

☐ one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s)(is)(are)

The verdict slip, in conjunction with the charge read at trial, emphasized a need for unanimity in finding "no mitigating circumstance." There is thus a reasonable likelihood that the jury failed to consider "factors which may call for a less severe penalty." *Mills,* 486 U.S. at 376, 108 S.Ct. 1860 (internal quotation omitted); *see also Hackett,* 2001 WL 884721, at *24–25 (discussing the *Hackett* verdict slip, which contained a checklist of findings with respect to aggravating and mitigating circumstances and no distinction between the burden of proof or unanimity required to find a particular aggravating or mitigating circumstance).

In addition, petitioner contends that the burden of proof charge with respect to the

existence of aggravating or mitigating circumstances exacerbated the possibility that the jury applied an unconstitutional understanding of the charge. In *Frey*, the Third Circuit found the following charge misleading:

> Now, the Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. . . . The defendant has the burden of proving mitigating circumstances but only by a preponderance of the evidence. This is a lesser burden of proof than beyond a reasonable doubt.

*Frey*, 132 F.3d at 923. As the *Frey* court explained, with respect to this instruction, "[i]t is what is *not* said here that is significant." *Id.* (emphasis in original).

The *Frey* court explained the deficiency of this charge as follows:

> [T]he trial court here did not stress that the different burdens that attach to aggravating and mitigating circumstances also entail different unanimity requirements. A lay jury might plausibly conclude, therefore, that aggravating *and* mitigating circumstances must be discussed and unanimously agreed to, as is typically the case when considering whether a burden of proof has been met.

*Frey*, 132 F.3d at 923–24 (emphasis in original). In light of the charge on mitigating and aggravating circumstances, the verdict slip, and the burden of proof charge, the *Frey* court stated that "it was reasonably likely that the jury could have believed that it was required to find the existence of mitigating circumstances unanimously before those circumstances could be considered in its deliberations." *Frey*, 132 F.3d at 924; *see Boyde*, 494 U.S. at 380, 110 S.Ct. 1190.

In this case, as in *Frey*, the trial court instructed the jury as to the burden of proof with respect to aggravating and mitigating circumstances without making clear that the jury need not find mitigating circumstances unanimously. The charge given in petitioner's case provided:

> The Commonwealth has the burden of proving any aggravating circumstance beyond a reasonable doubt. And I have already described for you and you have recently applied that standard. . . .
>
> The defendant, each defendant has a different degree of burden of proof with respect to mitigating factors. A defendant merely has to prove a mitigating circumstance to your satisfaction only by a preponderance. That's a lesser burden of proof than beyond a reasonable doubt.
>
> A preponderance exists where one side is more believable than the other side. . . .

Trial Tr. at 800 (May 20, 1988). The language of the charge given in petitioner's case suffers from the same deficiency as the charge given in *Frey*—it is reasonably likely the jury concluded it was required to discuss and unanimously agree that a particular mitigating circumstance was proved by a preponderance of the evidence as is typically the case when considering burdens of proof in deliberations.

Because the state court applied the incorrect rule to petitioner's case, the Court concludes that the Pennsylvania Supreme Court's determination on this issue is contrary to federal law as determined by the Supreme Court. Having concluded that there is a reasonable likelihood that the jury in this case applied the trial court's instructions in a way that precluded the consideration of constitutionally relevant evidence, and that this error was not harmless, Laird's petition for habeas corpus relief will be granted on this claim (Claim III) and his death sentence will be set aside without prejudice to the right of the Commonwealth of Pennsylvania to con-

duct a new capital sentencing hearing should petitioner be retried for first degree murder (*see supra* Part IV(A)(2)) and found guilty.

### 3. Mitigating and Aggravating Circumstances—The Trial Court's Introductory Comments

 Petitioner contends that the trial court's introductory comments to the jury regarding the nature and purpose of aggravating and mitigating circumstances were improper (Claim VIII), resulting in a violation of the Sixth, Eighth and Fourteenth Amendments. Specifically, petitioner objects to the following comments made by the trial judge at the beginning of the sentencing hearing:

> Whether you sentence a defendant to death or to life imprisonment would depend on what, if any, aggravating or mitigating circumstances you find are present in this case.

> In general terms, aggravating and mitigating circumstances are circumstances concerning the killing and the killer which make a first degree murder case either more serious or less serious.

Trial Tr. at 733 (May 20, 1988).

Petitioner argues that by using the words "in this case," the trial court improperly focused the jury's attention on the murder, and away from petitioner's background—that the trial court's comments instructed the jury it could only find evidence to be mitigating if it made "the case" "less serious," thus failing to convey to the jury that it could take petitioner's background and character into account in its analysis of mitigating circumstances. Petitioner also contends that his trial counsel was ineffective for failing to object to the court's comments. Respondents argue that the objected-to statement was merely introductory and, when the trial court's

jury charge is read as a whole, the court's instructions were reasonable.

The statements to which petitioner objects were introductory comments made by the trial court at the beginning of the sentencing hearing. The jury instructions given at the conclusion of the sentencing hearing clearly explained to the jury that it was required to examine the statutorily defined aggravating circumstances and mitigating circumstances, explaining that the jury must examine "the potential for aggravating circumstances first to one defendant and the potential for mitigating circumstances as to that defendant...." Trial Tr. at 796–97 (May 20, 1988). The trial court went on to explain the two possible aggravating circumstances in this case—killing in the perpetration of a felony and by means of torture. *Id.* at 797. The court then turned to the different potential mitigating circumstances for each defendant; with respect to Laird, the trial court mentioned the fact that petitioner had no significant history of prior criminal convictions, his youth at the time of the crime, his capacity to appreciate the criminality of his conduct and "any other mitigating matter concerning the character or record of the defendant or the circumstances of his offense." *Id.* at 799.

On PCRA review, the Pennsylvania Supreme Court concluded that the trial court's instructions as a whole correctly informed the jury of the law, citing *Commonwealth v. Saranchak*, 544 Pa. 158, 675 A.2d 268 (1996). In *Saranchak*, the Pennsylvania Supreme Court analyzed *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), in which the United States Supreme Court held that the Pennsylvania death penalty statute satisfied the requirement that a capital sentencing jury be permitted to give consideration to all relevant mitigating cir-

cumstances. *See Blystone*, 494 U.S. at 305, 110 S.Ct. 1078.

The PCRA court also observed that the sentencing scheme under the Pennsylvania death penalty statute, 42 Pa. Cons.Stat. Ann. § 9711, "requires the jury to consider both the nature of the murder and the character of the defendant. As the trial court's instructions simply and accurately conveyed the task before the jury there [was] no error." *Laird*, 555 Pa. at 659, 726 A.2d at 360–61. The Supreme Court of the United States has similarly held that evidence of a defendant's background and character are relevant in determining the sentence in a death penalty case. *See generally Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

The Court concludes that the Pennsylvania Supreme Court's determination on this issue was reasonable as the trial court's comments did not unconstitutionally divert the jury's attention to the crime and away from petitioner's personal culpability. As discussed *supra* Part IV(A)(2)(b), in analyzing jury instructions, the Court must first focus on the specific language challenged and then consider the allegedly infirm language in the context of the jury charge as a whole. *See Smith v. Horn*, 120 F.3d 400, 411 (3d Cir.1997). The central inquiry is whether there is a reasonable likelihood that the jury applied the instruction in a way that precluded its consideration of constitutionally relevant evidence. *See Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

Although the trial court's introductory comments may not have been complete with respect to the nature and purpose of aggravating and mitigating circumstances under Pennsylvania law, the trial court's later, more detailed charge correctly informed the jury that it was to consider any of the specific mitigating factors introduced at the sentencing hearing and "any other mitigating matter concerning the character or record of the defendant or the circumstances of his offense." Trial Tr. at 799 (May 20, 1988). The charge thus accurately informed the jury that it could take petitioner's background and character into account and the Court concludes that it is not likely that the jury applied the charge in a way that prevented the jury's consideration of constitutionally relevant evidence. Accordingly, this claim (Claim VIII) does not provide a basis for federal habeas relief.

### 4. Ineffectiveness of Counsel at Sentencing

Petitioner contends that he was deprived effective assistance of counsel during the sentencing phase of trial because counsel failed to investigate petitioner's background, a number of potential mitigating circumstances and counsel failed to interview several potential witnesses (Claim IV).[26] In support of his contention that there were a number of mitigating circumstances that should have been investigated in his case, petitioner points to, *inter alia*, his traumatic childhood; severe childhood physical and sexual abuse; a significant history of mental and emotional

**26.** Only one witness was presented on behalf of petitioner during the penalty phase of his trial—Barbara Sylvia. In a declaration submitted in support of Laird's petition, she stated that "[she] was instructed by Mr. Elgart [petitioner's trial attorney] to plead for Rick's life and to show the jury our newborn son.

Mr. Elgart never visited my home and never asked me any questions about Rick's background or his personality. I did not know that Rick's mental problems, head injuries or what he had gone through were important." Decl. of Barbara Sylvia ¶ 6 at 3 (Ex. 4 *in* Document No. 18, filed December 23, 1999).

disturbance, including Attention Deficit Hyperactivity Disorder ("ADHD"); a history of significant head traumas including a skull fracture; the effects of his history of alcohol and drug addiction; and that he suffers from Post–Traumatic Stress Disorder ("PTSD").

Petitioner contends that there were a number of potential witnesses [27] who would have provided a wealth of mitigating evidence about him, his background, and his impaired mental health. Petitioner further contends that his trial counsel failed to obtain a number of records about him, including hospitalization records documenting head injuries and school records reflecting petitioner's "long-term difficulties." Pet.'s Mem. of Law at 31 (Document No. 17, filed December 17, 1999). The affidavits and other evidence provided by these witnesses and others in support of Laird's habeas petition provide an overwhelming amount of highly compelling evidence to establish that petitioner was subjected to routine brutal physical and sexual abuse at the hands of his alcoholic father, that he drank and used drugs heavily, had suffered a number of significant head traumas, and that he suffers from a myriad of developmental and learning disabilities in addition to mental health problems. As

the amount of mitigating evidence offered in support of this claim is too extensive to recount in its entirety, the Court will only include in this Memorandum a small fraction of the testimony and evidence presented in the state PCRA proceedings and affidavits submitted in support of the petition.

Joyce Kessler, petitioner's mother, testified that petitioner's father, Richard Laird, Sr., was a complete alcoholic who regularly abused her and often forced petitioner to watch as a child, Decl. of Joyce Kessler ¶¶ 1–4 (Ex. 2 *in* Document No. 18, filed December 23, 1999); petitioner's father severely beat petitioner constantly as a child with little or no provocation, *id.* ¶ 6; [28] petitioner's birth was extremely difficult and required the use of forceps, *id.* ¶ 7; petitioner was identified as having serious problems at school, including inattentiveness and hyperactivity, for which his school suggested that petitioner be put on Ritalin, *id.* ¶ 9; petitioner's father used to provide petitioner with alcohol when he was young, *id.* ¶ 10; petitioner started drinking regularly at about fourteen years of age and used drugs, *id.* ¶¶ 11, 12; petitioner has suffered multiple head injuries, including one severe skull fracture sus-

---

**27.** In support of his habeas petition, petitioner contends that a number of potential witnesses were available to testify on his behalf, including, *inter alia,* Joyce Kessler, petitioner's mother; Mark Laird, petitioner's brother; JoAnne Samsel, petitioner's ex-wife and the mother of two of his children; Kimberly Kessler, a close friend of petitioner; and Barbara Sylvia, a close friend and the mother of one of petitioner's children. *See* Document No. 18, filed December 23, 1999. As set forth at *supra* note 26, Barbara Sylvia testified on petitioner's behalf during the penalty phase.

**28.** As explained by petitioner's mother, petitioner's father "never showed Ricky [petitioner] love or affection of any kind. He called him names all the time. He beat young Ricky constantly, for no reason at all. He would

punch young Ricky. He would kick him all over his body, and would kick him on the groin. He would punch him in the face and head, and kick him there also. He hit him with boards and belts and wire hangers, all over Ricky's body. He seemed to especially enjoy striking Ricky on the groin and the head. Ricky's crying only made the beatings last longer, until Mr. Laird, Sr., was out of breath.... Mr. Laird treated Ricky horribly.... He choked young Ricky several times with his large hands, as he did with me. Mr. Laird also acted very inappropriately in his abuse of Ricky, forcing Ricky to engage in acts that no child should do and no one should be forced to do...." Decl. of Joyce Kessler ¶ 6.

tained when petitioner fell from a moving car, *id.* ¶ 13; and that petitioner was subjected to two severe beatings by his father resulting in head injuries that required medical treatment. *Id.*

In addition to the numerous abuses and traumas detailed by petitioner's mother, three of petitioner's close friends, Kimberly Kessler, Barbara Sylvia, and JoAnne Samsel, testified that Laird appeared to suffer from severe mental problems—including severe mood swings, delusions and seeing things that were not there. Decl. of Kimberly Kessler ¶ 2, 3 (Ex. 3 *in* Document No. 18, filed December 23, 1999); Decl. of Barbara Sylvia ¶ 5 (Ex. 4 *in* Document No. 18, filed December 23, 1999); Decl. of JoAnne Samsel ¶ 4 (Ex. 5 *in* Document No. 18, filed December 23, 1999). In addition, these witnesses testified that petitioner had been sexually abused by his father. *See* Decl. of Kimberly Kessler ¶ 6 ("Rick confided in me that he had been sexually abused by his father. Rick told me that when he was a child, Mr. Laird would come naked into his bedroom and force Rick to perform oral sex on him. After Mr. Laird was done, he would beat Rick up, call him a 'nasty son-of-a-bitch' and tell him to go wash out his mouth or brush his teeth. Rick hated talking about this...."); Decl. of Barbara Sylvia ¶ 8; Decl. of JoAnne Samsel ¶ 2.

Petitioner also contends that trial counsel should have presented medical and mental health experts to testify about the psychological effects of petitioner's traumatic childhood; his mental, emotional and developmental problems; his head trauma; and his alcohol and drug addiction. Upon evaluating Laird at the request of petitioner's counsel during the state PCRA proceedings, Dr. Henry Dee ("Dr. Dee"), a psychologist and neuropsychologist, concluded, to a reasonable degree of certainty, that petitioner suffers from organic brain damage, post-traumatic syndrome as a result of his abusive childhood, and ADHD. *See* PCRA Hr'g Tr. Vol. I at 47, 50–52, 102, 109–11 (testimony of Dr. Henry Dee, January 21, 1997). With respect to petitioner's history of head traumas, Dr. Dee conducted a review of petitioner's medical records, and explained that petitioner's injuries that resulted from falling off a moving car were especially significant. The records showed that petitioner sustained a linear skull fracture of the occipital bone and that a "blow to the head that is sufficiently severe to render the skull fractured must result in considerable tissue loss and damage." *Id.* at 60 (testimony of Dr. Henry Dee; January 21, 1997). Dr. Dee also testified at the PCRA hearing regarding the mental health problems that can result from childhood physical and sexual abuse, *id.* at 82–88, 92–96; and that petitioner suffered from ADHD, which helps explain petitioner's drug and alcohol use.

As explained by Dr. Dee, "you frequently find [abuse of] stimulant medications in patients that are Attention Deficit Disorder patients because they sort of accidentally discover that that medication helps them focus, behave more productively." *Id.* at 116. Dr. Dee's testimony is corroborated by the observations of those close to petitioner—Barbara Sylvia, JoAnne Samsel, and Frank Chester all testified that the drug speed calmed petitioner down and even helped him sleep. Decl. of Barbara Sylvia ¶ 6; Decl. of JoAnne Samsel ¶ 7; Decl. of Frank Chester ¶ 4 (Ex. 6 *in* Document No. 18, filed December 23, 1999). Petitioner's reaction to the drug speed was also explained by Dr. Robert Fox ("Dr. Fox"), a psychiatrist who conducted an assessment of petitioner at the request of petitioner's counsel during PCRA proceedings. According to Dr. Fox,

individuals suffering from Attention Deficit, whether they be children or adults, they have what is described as a paradoxical, in other words, an opposite response to stimulating substances.

So that if you give somebody who is hyperactive a drug that would make a normal individual hyperactive, rather than making them more hyperactive it, in fact, slows them down.

PCRA Hr'g Tr. Vol. II at 85 (testimony of Dr. Robert Fox, January 22, 1997). In addition, Dr. Fox testified regarding petitioner's PTSD, other psychological impairments, petitioner's drug and alcohol abuse, and his belief that petitioner suffered from brain damage.

Petitioner contends that counsel's deficient performance in failing to investigate and present such mitigating evidence during sentencing constituted a violation of his Sixth Amendment right to effective assistance of counsel and that his right to a fair and reliable capital sentencing was denied in violation of the Eighth and Fourteenth Amendments. Respondents argue that the state court's treatment of this issue should not be disturbed for the reasons stated in the Pennsylvania Supreme Court's opinion; it is respondents' position that the state court's determination on this issue does not result in a decision that is contrary to, or an unreasonable application of, federal law. Respondents also contend that trial counsel's strategy should be afforded substantial deference.

### a. Ineffective Assistance of Counsel Under Strickland

Petitioner argues that the Pennsylvania Supreme Court failed to apply Sixth Amendment law to this claim, resulting in a decision that was contrary to, and/or an unreasonable application of, federal law as established by the Supreme Court of the United States. In addition, petitioner argues that the Pennsylvania Supreme Court's decision on this issue "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (Supp. V 1999). As the Pennsylvania Supreme Court adjudicated this claim on the merits, the AEDPA is applicable.

Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), it is well-settled that, in order to establish a claim for ineffective assistance of counsel at trial or at a death penalty sentencing proceeding, a convicted defendant must demonstrate that his counsel's performance (1) "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, and (2) that counsel's deficient performance prejudiced the defense. *Id.* at 692, 104 S.Ct. 2052. As explained by the Supreme Court in *Strickland*, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052.[29] The ultimate focus of the *Strickland* inquiry is always on the fundamental fairness of the proceeding the result of which is being challenged. *Id.* at 696, 104 S.Ct. 2052.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, the Court must examine

---

**29.** As *Strickland* itself involved a capital sentencing proceeding, the Supreme Court explained that "[a] capital sentencing proceeding ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland,* 466 U.S. at 686–87, 104 S.Ct. 2052.

"whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. 2052. The Supreme Court has identified some of counsel's basic duties, including a duty to consult with the defendant on important decisions, to keep the defendant informed of important developments in the prosecution and "to bring to bear such skill and knowledge as will render the trial [or sentencing proceeding] a reliable adversarial testing process." *Id.* With respect to counsel's duty of investigation, the Supreme Court wrote in *Strickland:*

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.*

*Id.* at 690–91, 104 S.Ct. 2052 (emphasis added).

■■■ Thus, under *Strickland,* counsel's failure to assert a particular defense can not be characterized as a "strategy" unless counsel has investigated and consciously rejected a particular defense. *See United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir.1997). As explained in *United States v. Gray,* 878 F.2d 702 (3d Cir.1989), "[i]neffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Id.* at 711. "Under [such] circumstances, counsel's behavior [is] not colorably based on tactical consid-

erations but merely upon a lack of diligence." *Id.* at 712.

With respect to demonstrating actual prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. With respect to challenges to a death sentence, such as the sentence challenged in *Strickland,* "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052.

#### b. The Pennsylvania Supreme Court Opinion

The state supreme court's PCRA opinion in this case sets forth a three-prong test for ineffective assistance of counsel claims. Under that test, a defendant must show: "(1) the underlying claim is of arguable merit; (2) counsel's performance was unreasonable; and (3) counsel's ineffectiveness prejudiced defendant.'" *Laird,* 555 Pa. at 642, 726 A.2d at 352 (quoting *Commonwealth v. Beasley,* 544 Pa. 554, 565, 678 A.2d 773, 778 (1996)). As the state court's formulation of the standard for ineffective assistance of counsel presents essentially the same inquiry as the test established in *Strickland,* this Court concludes that this claim was adjudicated on the merits and the AEDPA is applicable. *See Kennedy v. Colleran,* 2000 WL 1470218, at *2–3 (E.D.Pa. Oct.3, 2000) (concluding that a three-prong test inquiring into whether "(1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for the act or omission in

question; and (3) but for counsel's act or omission, the outcome of the proceedings would have been different" does not contradict *Strickland* and its progeny).

This Court concludes that the Pennsylvania Supreme Court's disposition of this claim resulted in a decision that was both contrary to, and an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). In its discussion regarding counsel's performance at the penalty phase, the Pennsylvania Supreme Court, relying on *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613 (1991), wrote that "[c]ounsel will not be deemed ineffective for pursuing a particular strategy, as long as the course chosen was reasonable." *Laird*, 555 Pa. at 653, 726 A.2d at 357. The Pennsylvania Supreme Court also relied on a stipulation regarding trial counsel's testimony, writing that, based on the stipulation, the court "cannot conclude that trial counsel was unaware of the potential to present evidence of petitioner's mental and emotional state." *Id.*

The Pennsylvania Supreme Court's PCRA opinion also includes speculation as to the possible reasons for trial counsel's "strategic" decisions. For example, the

state supreme court theorized that the presentation of mitigating evidence of the sort now offered would have conflicted with the testimony and arguments that were presented. The court concluded that the introduction of such evidence would open the door to information detrimental to petitioner. *Laird*, 555 Pa. at 654, 726 A.2d at 358. With respect to this issue, the state supreme court speculated as follows:

> It is entirely possible that trial counsel received reports on petitioner's mental state similar to the one of Dr. Silverman,[ [30] ] and for that reason chose not to offer psychological testimony at the penalty hearing; or trial counsel considered the possibility that the Commonwealth would present psychological testimony similar to that of Dr. Silverman in rebuttal.

*Laird*, 555 Pa. at 654–55, 726 A.2d at 358.

### c. *Analysis and Conclusions*

■ As an initial matter, the Court determines that the Pennsylvania Supreme Court's conclusions with respect to the stipulation regarding trial counsel's (Mr. Elgart's) testimony are based on an "unreasonable determination of the facts in

**30.** As explained by the Pennsylvania Supreme Court, Dr. Joseph S. Silverman ("Dr.Silverman") examined petitioner at the request of petitioner's first PCRA counsel. Dr. Silverman's diagnosis was, in the Pennsylvania Supreme Court's view, different from that of Dr. Dee and Dr. Fox. "Dr. Silverman was of the opinion that petitioner did not suffer any mental disorder, but rather exhibited an antisocial personality, a lack of regard for the rights of others, a strong dislike for homosexuals (the victim of the murder was thought to be a homosexual by petitioner and co-defendant Chester), and a pronounced enjoyment of the material benefits of a criminal lifestyle." *Laird*, 555 Pa. at 654, 726 A.2d at 358.

The Court notes that Dr. Silverman's report actually provided potentially mitigating evidence, including the opinion that Laird's homophobia may have been caused by the fact that "at about age 9 he had been required to perform fellatio on an adult male [relative] on a few separate occasions." Psychiatric Report by Joseph S. Silverman at 2 (November 6, 1994) (Ex. 8 *in* Document No. 18, filed December 23, 1999). In addition, Dr. Silverman's report provided information regarding petitioner's history of head traumas and petitioner's history of alcoholism; Dr. Silverman ultimately concluded that "[i]t appear[ed] to [him] that at the time of the killing of Anthony Milano Mr. Laird was intellectually impaired to such a degree that his judgment and self-control were undermined...." *Id.* at 3.

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). During the course of one of petitioner's PCRA hearings, counsel for the government read the following stipulation into the record:

> That if Mr. Elgart were called as a witness in this proceeding today he would testify substantially as follows:

> That he, after consultation with his client, did not choose to call any mental health professionals, such as psychologists or psychiatrists at the guilt phase because his defense and that of his client was not guilty.

> Stated more succinctly, as the trial record will bear out, Mr. Laird had interposed as a defense at the guilt phase that it was Frank Chester who committed the homicide and not Richard Laird.

> Mr. Elgart will testify substantially that given that focus of the defense, he and his client believed that there was no reason to call a mental health professional at that guilt phase given the nature of that defense.

PCRA Hr'g Tr. Vol. IV at 5–6 (January 24, 1997). Despite the express language of the stipulation, which stated that petitioner's trial counsel, Mr. Elgart, had made a strategic decision with respect to calling a mental health profession *at guilt phase,* the Pennsylvania Supreme Court assumed that Mr. Elgart was thus aware of the potential to present evidence regarding petitioner's mental health as mitigating evidence at the sentencing phase. The state court's conclusion is clearly erroneous.

Petitioner and trial counsel decided to present an innocence defense during the guilt phase as opposed to, for example, a diminished capacity defense that might require evidence of petitioner's mental and emotional health. There is no evidence that trial counsel conducted any inquiry into petitioner's background and medical

history in connection with the penalty phase. The state court's assumption that, having considered the possibility of presenting such evidence during the guilt phase, trial counsel was thus aware of the vast amount of mitigating evidence that was available in this case is entitled to no deference.

The Pennsylvania Supreme Court also concluded that "[c]ounsel will not be deemed ineffective for pursuing a particular strategy, as long as the course chosen was reasonable," *Laird,* 555 Pa. at 653, 726 A.2d at 357. That conclusion does not comport with *Strickland*'s holding that counsel has a duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. In this case, as set forth above, trial counsel failed to investigate the availability of a wealth of significant mitigating evidence; he had no basis on which to make a reasonable decision that such investigation was unnecessary. The Pennsylvania Supreme Court's decision on this issue is thus contrary to clearly established federal law. As explained by the Eleventh Circuit, "trial counsel's failure to investigate, present and argue to the jury at sentencing any evidence of appellant's mental history and condition constituted error so serious that counsel was not functioning as the 'counsel guaranteed the defendant by the Sixth Amendment.'" *Stephens v. Kemp,* 846 F.2d 642, 652 (11th Cir.1988) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052); *compare Burger v. Kemp,* 483 U.S. 776, 788–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (concluding that counsel's failure to present any mitigating evidence was based on reasonable tactical decision) and *Deputy v. Taylor,* 19 F.3d 1485, 1494 (3d Cir.1994) (same) *with Kenley v. Armontrout,* 937 F.2d 1298, 1304–09 (8th Cir.1991) (concluding that tri-

al counsel's failure to investigate and present mitigating circumstances constituted ineffective assistance when counsel had no strategic reason to do so).

Trial counsel did present some evidence of mitigating circumstances; the Pennsylvania Supreme Court summarized the mitigating evidence presented at petitioner's trial as follows:

> In mitigation counsel argued petitioner's youth, petitioner was 24 years old at the time of trial, petitioner's lack of a history of violent crimes, petitioner's state of intoxication at the time of the offense, and petitioners [sic] role as a father, devoted to his young children. Counsel also asked the jury to spare petitioner as he was the son of a career Marine Corps Officer. Trial counsel presented a picture of petitioner as a young man who loves his children and has no history of violent antisocial behavior.

*Laird,* 555 Pa. at 653–54, 726 A.2d at 358 (footnote omitted). The specific mitigating circumstances presented during the penalty phase were 42 Pa. Cons.Stat. Ann. § 9711(e)(1), (4) and (8).[31] *Id.* at 654 n. 10, 726 A.2d at 358 n. 10. In addition, trial counsel presented one witness in the penalty phase—Barbara Parr (now Barbara Sylvia), who was petitioner's fiancée at the time. She made a general plea to the jury for mercy and showed the jury petitioner's newborn son.

This Court concludes that the fact trial counsel presented some mitigating evidence does not warrant the conclusion that his failure to investigate other potential sources of mitigating evidence was thus reasonable. *See, e.g., Jermyn v. Horn,* 1998 WL 754567, at *17 (M.D.Pa. Oct.27, 1998) ("Presentation of some mitigating evidence does not excuse the failure to provide evidence of different mitigating circumstances.").

Finally, the state supreme court's post-hoc speculation regarding possible reasons for trial counsel's actions does not somehow render trial counsel's performance constitutionally adequate. As explained by the Fourth Circuit, "courts should not conjure up tactical decisions an attorney could have made, but plainly did not. . . . Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another." *Griffin v. Warden,* 970 F.2d 1355, 1358–59 (4th Cir.1992); *see also Harris v. Reed,* 894 F.2d 871, 878 (7th Cir.1990) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer."); *Hardcastle v. Horn,* 2001 WL 722781, at *10–13 (E.D.Pa. June 27, 2001) (concluding that the state court applied the rule announced in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in a way that is contrary to, and an unreasonable application of, federal law when the state court sua sponte generated justification for the prosecution's challenges of prospective jurors). As there is no strategic explanation for trial counsel's failure to investigate the wealth of mitigating evidence available in this case, the Court concludes that trial counsel's performance was objectively unreasonable.

---

**31.** 42 Pa. Cons.Stat. Ann. § 9711(e) provides, in pertinent part, as follows:

> Mitigating circumstances shall include the following:
>
> (1) The defendant has no significant history of prior criminal convictions.
>
> . . .

(4) The age of the defendant at the time of the crime.

. . .

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

The Court further concludes that petitioner suffered substantial prejudice as a result of trial counsel's deficient performance, resulting in a questionable penalty phase outcome. "In the context of a death penalty hearing, the second prong [of *Strickland*] is satisfied if there was a reasonable probability that at least one juror would be sufficiently influenced by mitigation evidence to vote against the imposition of the death penalty." *United States ex rel. Emerson v. Gramley*, 883 F.Supp. 225, 242 (N.D.Ill.1995). Given the overwhelming mitigating evidence that would have been available in this case had trial counsel conducted even a cursory investigation into petitioner's background, the Court concludes that, absent trial counsel's egregious errors, there is a reasonable probability that the sentencing jury would have concluded the mitigating circumstances in this case substantially outweigh the aggravating circumstances.[32] *See Strickland*, 466 U.S. at 695, 104 S.Ct. 2052.

Having determined that petitioner's trial counsel's performance at sentencing fell below an objective standard of reasonableness due to his failure to conduct any investigation into petitioner's background and many possible sources of mitigating evidence and that petitioner suffered prejudice as a result of counsel's deficient performance, the Court concludes that petitioner is entitled to habeas relief on this claim (Claim IV). Petitioner's death sentence will be set aside without prejudice to the right of the Commonwealth of Pennsylvania to conduct a new capital sentenc-

ing hearing should petitioner be retried for first degree murder (*see supra* Part IV(A)(2)) and found guilty.

### 5. Coercion of Petitioner's Death Sentence by the Trial Court

Petitioner claims that his death sentence was coerced by the trial judge in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments (Claim V). Respondents contend that this claim is procedurally defaulted as petitioner did not fairly present this issue to the state courts as a federal constitutional issue and, in the alternative, that the state supreme court's disposition of this issue did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law.

Petitioner presented this claim on direct appeal, detailing the underlying facts that give rise to the claim and citing many state law cases, 42 Pa. Cons.Stat. Ann. § 9711(c)(1)(v),[33] and one United States Supreme Court case, *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824), a case that concerns the double jeopardy implications of discharging a hung jury. The issue was not presented by petitioner during the state PCRA proceedings. As this claim was presented as a double jeopardy issue on direct appeal and the facts alleged do not fall within the mainstream of constitutional litigation such that the state supreme court was on notice that a federal claim was being asserted, the Court concludes

---

**32.** This conclusion of course assumes that the jurors had a correct understanding that each of them was permitted to individually consider mitigating circumstances. As discussed *supra* Part IV(A)(2), however, in light of the *Mills* error that occurred in this case, it is not likely that petitioner's actual jury had a constitutionally adequate understanding of the trial court's mitigating circumstances charge.

**33.** 42 Pa. Cons.Stat. Ann. § 9711(c)(1)(v) provides as follows:

[T]he court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment.

that the claim was never fairly presented to the state courts and is thus procedurally defaulted.[34]

Petitioner argues that this claim was automatically exhausted by virtue of the state's mandatory appellate review of capital cases pursuant to 42 Pa. Cons.Stat. Ann. § 9711(h). This Court disagrees with petitioner, concluding that this claim is not one that falls within the Pennsylvania Supreme Court's mandatory appellate review. As discussed *supra* Part III(B), § 9711(h)(3) provides: "The Supreme Court shall affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor." Pennsylvania's mandatory appellate review procedure does not exhaust this claim as the facts alleged do not present a fundamental constitutional error that implicates the grounds for relief set forth in § 9711(h)(3). Accordingly, the Court concludes that the claim is procedurally defaulted and that federal habeas relief on this claim is foreclosed.

■■■ In addition, even assuming that the claim were not procedurally defaulted, the Court concludes that petitioner would not be entitled to relief on this issue. As summarized by the state supreme court, the following events occurred at trial:

Three hours after the jury retired to deliberate, on Friday, May 20, 1988, the trial judge received a note from the jury indicating that it felt "that at this time or at any time in the future, we can not [sic] come to a[sic] agreement or decision on the sentencing verdict ... because of differences in opinion." Coun-

sel for both defendants moved that a mistrial be declared and the defendants sentenced to life imprisonment. As only three hours had elapsed since the deliberations began and the case involved two defendants, that motion was denied. (N.T. 5/20/88, pp. 805–807.) At 7:45 p.m. the court suspended deliberations so that the jurors could eat and sleep for the night. (*Id.*, pp. 808–809.)
On Saturday, May 21, 1988, deliberations began at 9:48 a.m. At 3:30 p.m. the jury was reconvened by the court and the judge engaged in the following exchange with the foreman.

THE COURT: Good afternoon, Mr. Henry.
JURY FOREPERSON: Good afternoon.
THE COURT: By the computation which I have been keeping we have noted that you resumed your deliberations this morning at approximately 9:48. And I note the time now is approximately 3:10.

It is not my purpose at this time nor should you in any way disclose— it's not my purpose to find out, nor should you in any way disclose how the jury stands with respect to the issues you are now considering. It would be most inappropriate for me to inquire as to that or for you to reveal it.

I had asked Mrs. Happ to consult with you about whether you wish to receive some food at this time and she advises me that you did. That seemed to be an appropriate time to inquire of you, sir, whether you be-

---

**34.** The Court notes, however, that the claim is exhausted as the Pennsylvania Supreme Court would have concluded on PCRA review that this claim was previously litigated as the state court evaluated the claim on direct review and that the claim thus did not provide a ground for PCRA relief. In the alternative, the Pennsylvania Supreme Court would undoubtedly reject the federal claim as waived and thus defaulted under the procedural rule announced in *Albrecht*.

lieve that further deliberations will result in a verdict on either of these cases for today?

JURY FOREPERSON: I can't foresee today, no.

THE COURT: Can you foresee at any time?

JURY FOREPERSON: No.

THE COURT: Would it be worthwhile for you to submit a food order, receive the food and deliberate for a few hours further?

Would that be of any use, do you believe?

JURY FOREPERSON: We could.

THE COURT: I understand that. But do you believe that would be of use to you?

JURY FOREPERSON: No.

THE COURT: Do you believe that deliberations for a further half-hour or so might be productive?

JURY FOREPERSON: No.

THE COURT: Do you believe that it is possible for this jury to reach a unanimous agreement on either of these sentences?

JURY FOREPERSON: No.

THE COURT: Is that a matter you feel strongly convinced of?

JURY FOREPERSON: Very strongly.

The judge then, in a sidebar discussion with counsel, debated whether the jury was hopelessly deadlocked or would be able to reach a decision. After both sides voiced their respective positions, the judge summoned the jury.

THE COURT: Please be seated.

Mr. Henry, have you—I have a couple more questions for you.

One is: In the course of my earlier discussion with you, of course we're referring to both cases, it is possible that you may be able to reach unanimous verdict with either one of these cases?

JURY FOREPERSON: No.

THE COURT: Do you believe that were you to continue to deliberate there is any hope whatsoever that a verdict could be achieved, a unanimous verdict be achieved on either of these cases?

JURY FOREPERSON: (Pause) There is a doubt. There's a doubt.

THE COURT: There's a doubt?

I'm going to take that answer that there may be some possibility?

JURY FOREPERSON: There may, yes.

THE COURT: Helen.

(Off-the-record conversation with tipstaff)

THE COURT: In light of that answer, you may continue your deliberation for a period of time longer.

Should you in the course of these deliberations conclude that there is no hope whatsoever, you would communicate that to me in writing through Mrs. Happ.

JURY FOREPERSON: Yes.

THE COURT: I've also spoken with her about arranging for some modest, not heavy but some modest food for you.

All right.

(The jury retires to the jury room to deliberate upon its verdict at 3:55 p.m.)

The jury rendered its verdict at 5:35 that evening.

*Chester,* 526 Pa. at 602–05, 587 A.2d at 1379–80. *See* Trial Tr. at 804–28 (May 20–21, 1988).

In its analysis of this claim on direct review, the Pennsylvania Supreme Court wrote: "It is well-established that a ver-

dict brought about by judicial coercion is a legal nullity. . . . However, the extent of time during which a jury is kept together for deliberation is a matter within the discretion of the trial judge. . . ." *Chester*, 526 Pa. at 605, 587 A.2d at 1380. The state court then observed that the jury in this case deliberated for approximately thirteen hours on the question of whether to impose the death penalty and concluded that, under all of the circumstances of this case, the trial judge acted reasonably.

The United States Supreme Court has recognized that, under certain circumstances, a trial court's instructions to a seemingly deadlocked jury can result in coercion such that a defendant is denied her right to a fundamentally fair trial. In evaluating a claim of coercion, this Court must consider the instructions given to the jury under all of the circumstances. *See Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (per curiam).

In *Lowenfield*, a defendant who had been convicted of first-degree murder and sentenced to death petitioned for federal habeas relief, arguing that the trial court had improperly coerced the sentencing jury into reaching a verdict. During the penalty phase, the jury in *Lowenfield* began its deliberations on sentencing on the same day that it returned its verdict of guilt. The jury was then allowed to reconvene the next day and resume deliberations. On the second day, the jury sent a note to the trial court stating that it was unable to reach a verdict and that it would like the court to advise the jury of its responsibilities. In response, the court, by note, asked each juror to answer, by note, the question whether "further deliberations would be helpful in obtaining a verdict." *Lowenfield*, 484 U.S. at 234, 108

S.Ct. 546. The notes from the jurors revealed eight answers stating that additional time would be helpful and four answers stating that additional time would not be helpful. Upon returning to the courtroom for further instructions from the judge, the jury gave the trial judge a second note which stated that some of the jurors had misunderstood the previous question. The judge then polled the jury by asking: "Do you feel that any further deliberations will enable you to arrive at a verdict?" *Id.* In response, eleven jurors answered in the affirmative and one answered in the negative. The trial court then read a supplemental jury instruction to the jury and told the jury to continue its deliberations.

The United States Supreme Court concluded that "on these facts the combination of the polling of the jury and the supplemental instruction was not 'coercive' in such a way as to deny petitioner any constitutional right." *Id.* at 241, 108 S.Ct. 546. The Court went on to state that different circumstances—other combinations of polling the jury and supplemental instructions—might warrant a different outcome. The central inquiry is whether the jury was coerced under all of the circumstances as "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Id.* at 241, 108 S.Ct. 546.

In this case, the sentencing jury was charged with determining whether both petitioner and his co-defendant should be sentenced to life imprisonment or the death penalty. Considering the gravity of the jury's task, the foreperson's statement to the trial judge that there was some hope that a unanimous verdict might be reached and the trial court's final instructions to the jury about communicating with the court should the jury conclude that there was no hope whatsoever of reaching

a verdict, the Court concludes that the verdict of death was not coerced by the trial judge, but was the product of the jury's difficult deliberations. Accordingly, even if this claim were not procedurally defaulted, Laird's petition would be denied with respect to this issue.

The Court also concludes that petitioner's state counsel was not ineffective for failing to properly present this claim as a federal issue to the state court as a defendant cannot suffer prejudice by virtue of counsel's failure to raise a meritless claim. For the reasons stated above, the Court concludes that petitioner's claim that his death sentence was coerced by the trial judge (Claim V) does not constitute a basis for habeas relief.

### 6. "Life means life" Charge

■ Petitioner argues that the trial court should have instructed the jury that a life sentence means life without parole (Claim VII) as is now required under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) and its progeny.[35] In *Simmons*, the Supreme Court concluded that a defendant who is facing a death sentence or a sentence of life without the possibility of parole is entitled to an instruction that life imprisonment means life without the possibility of parole when the state argues future dangerousness to the jury as an aggravating factor.

In *Ramdass v. Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), the Supreme Court extended the rule announced in *Simmons*, writing that "[t]he parole-ineligibility instruction is required only when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law." *Id.* at 166, 114 S.Ct. 2187. The Supreme Court then concluded in *Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001), that a petitioner is not entitled to a *Simmons* charge when his parole ineligibility under state law is not clearly established at the time he faces the death penalty.

Respondents argue that the rule in *Simmons* is new under the principles announced in *Teague v. Lane*, and that it is thus not applicable to petitioner's case. *Cf. Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (holding that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced"); *see also Williams v. Taylor*, 529 U.S. 362, 380, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (con-

---

**35.** The Court notes that Pennsylvania appears to be the only state in which a criminal defendant facing either the death penalty or life without the possibility of parole does not receive a *Simmons* charge as a matter of course. As observed by the United States Supreme Court in *Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 1271 n. 4, 149 L.Ed.2d 178 (2001):

At the time we decided *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), South Carolina was one of only three states—Pennsylvania and Virginia were the others—that "ha[d] a life-without-parole sentencing alternative to capital punishment for some or all convicted murderers but refuse[d] to inform sen-

tencing juries of th[at] fact." *Id.*, at 168, n. 8, 114 S.Ct. 2187. Since *Simmons*, Virginia has abandoned this practice. *Yarbrough v. Commonwealth*, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999) ("[W]e hold that in the penalty-determination phase of a trial where the defendant has been convicted of capital murder, in response to a proffer of a proper instruction from the defendant prior to submitting the issue of penalty-determination to the jury or where the defendant asks for such an instruction following an inquiry from the jury during deliberations, the trial court shall instruct the jury that the words 'imprisonment for life' mean 'imprisonment for life without possibility of parole.' ").

cluding that the AEDPA codifies *Teague* to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a new rule of law). It is petitioner's position that his claim is not based on a new rule; he relies on pre-*Simmons* United States Supreme Court precedent for the proposition that he was denied due process when his sentencing jury returned a sentence of death on the basis of inaccurate information. Petitioner also contends that a failure to inform the jury that life imprisonment means life without the possibility of parole precluded the jury from (1) considering the mitigating fact that petitioner would not be released if sentenced to life imprisonment; and (2) giving full consideration to the other relevant mitigating evidence presented at the sentencing hearing.

On PCRA appeal, the Pennsylvania Supreme Court concluded that petitioner was not entitled to a *Simmons* charge as his future dangerousness was not argued to the jury as an aggravating circumstance. *Laird*, 555 Pa. at 658, 726 A.2d at 360. The court further concluded that, regardless of whether a *Simmons* charge was warranted in this case, Laird could not benefit from the rule announced in *Simmons* as it was new and not retroactively applicable to petitioner's case.

With regard to petitioner's first contention—that he was denied due process—the Court concludes that the rule announced in *Simmons* is new within the meaning of *Teague* and § 2254, as amended, and that it is thus inapplicable to petitioner's case. In *O'Dell v. Netherland*, 521 U.S. 151, 166–67, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997), the Supreme Court considered a claim very similar to the one presented by petitioner in this case. Relying on *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), and *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d

393 (1977), the petitioner in *O'Dell* argued that a reasonable jurist considering his claim would have been compelled by precedent to reach the result reached by the Supreme Court in *Simmons* and that he was entitled to a jury instruction stating that a life sentence means life without the possibility of parole. Upon consideration of all of the relevant precedent, the Supreme Court concluded in *O'Dell* that it would have been reasonable for a court to conclude in 1988 that it is constitutional for the state not to instruct jurors "as to events that would (or would not) follow their recommendation of a death sentence...." *O'Dell*, 521 U.S. at 165, 117 S.Ct. 1969.

Accordingly, the Supreme Court held that the rule announced in *Simmons* was new, *id.* at 166, 114 S.Ct. 2187, and that it "possesses little of the 'watershed' character envisioned by *Teague*'s second exception." *Id.* at 167, 117 S.Ct. 1969. Like the petitioner in *O'Dell*, Laird relies on *Skipper* and a number of cases that concern the constitutionality of a sentence imposed on the basis of inaccurate or incomplete information. *See, e.g., Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (concluding that due process is violated where a "prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue"). As in *O'Dell*, however, "two other cases that had been decided by the time petitioner's conviction became final ... bear on its constitutionality: *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), and *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)." *O'Dell*, 521 U.S. at 163, 117 S.Ct. 1969.

In *Ramos*, the Supreme Court upheld an instruction that informed the jury that a defendant sentenced to a life sentence could have his sentence commuted by the

governor and thus be rendered parole eligible. In its approval of this instruction, the *Ramos* Court emphasized that the "decision to permit juror consideration of possible commutation is best left to the States." *Ramos,* 463 U.S. at 1014, 103 S.Ct. 3446. Furthermore, as explained by the *O'Dell* Court, "[t]he general proposition that the States retained the prerogative to determine how much (if at all) juries would be informed about the post-sentencing legal regime was given further credence in *Caldwell v. Mississippi* . . . ." *O'Dell,* 521 U.S. at 164, 117 S.Ct. 1969. In *Caldwell,* Justice O'Connor, who provided the fifth vote necessary to the judgment, did not join the portion of Justice Marshall's opinion that concluded sentencing juries were not to be instructed on post-sentencing proceedings. Rather, Justice O'Connor wrote that a state could choose whether to "instruc[t] the jurors on the sentencing procedure, including the existence and limited nature of appellate review," as long as the information provided to the jury was accurate. *Caldwell,* 472 U.S. at 342, 105 S.Ct. 2633 (O'Connor, J., concurring in part and concurring in the judgment). Furthermore, as observed by Justice O'Connor in *Simmons* itself:

> [The Court has] previously noted with approval . . . that "[m]any state courts have held it improper for the jury to consider or to be informed—through argument or instruction—of the possibility of commutation, pardon, or parole." *California v. Ramos,* 463 U.S. [992], 1013, n. 30, 103 S.Ct. 3446, 77 L.Ed.2d 1171. The decision whether or not to inform the jury of the possibility of early release is generally left to the States.

*Simmons,* 512 U.S. at 176, 114 S.Ct. 2187 (O'Connor, J., concurring in judgment, joined by Rehnquist, C.J. and Kennedy, J.).

Given that the Supreme Court had long written that the state had discretion as to whether to instruct the jury regarding a defendant's parole eligibility, and its holding in *O'Dell* that the rule announced in *Simmons* is new, the Court concludes that the state court's application of relevant federal law on this issue during PCRA review was reasonable and that this issue does not constitute a ground for federal habeas relief.

Petitioner's second argument—that the jury was precluded from considering relevant mitigating evidence—was not considered by the Pennsylvania Supreme Court on PCRA review despite being presented to that court by petitioner. However, this Court concludes that it provides no basis for relief. As observed by Justice O'Connor, joined by Chief Justice Rehnquist and Justice Kennedy, the Supreme Court has historically left to the states the decision whether or not to provide the jury with information regarding parole eligibility. *Simmons,* 512 U.S. at 176, 114 S.Ct. 2187 (O'Connor, J., concurring in judgment).

The United States Supreme Court did not clearly state particular circumstances under which the jury must be informed that a defendant is parole ineligible until *Simmons* and *Ramdass.* Accordingly, the law on this issue was not clearly established by the United States Supreme Court when petitioner's conviction became final on October 7, 1991, the date on which petitioner's application for a writ of certiorari on direct appeal was denied. *See Laird v. Pennsylvania,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The Pennsylvania Supreme Court's disposition of this issue was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. This Court thus concludes this claim (Claim VII) does not provide a basis for federal habeas relief.

### 7. *Proportionality Review*

Petitioner argues that the proportionality review used in his case was unconstitutional (Claim IX). Under the former 42 Pa. Cons.Stat. Ann. § 9711(h)(3)(iii),[36] the Pennsylvania Supreme Court was required to conduct a review in order to determine whether the sentence of death in a specific case is disproportionate or excessive in comparison with similar cases. Respondents argue that petitioner has no constitutional right to a proportionality review and that it cannot form the basis for habeas relief. Respondents further contend that any error by the state supreme court with respect to this issue is an error of state law and not reviewable by this Court.

The Pennsylvania Supreme Court considered this issue on direct review and determined that the punishment in this case was not excessive or disproportionate in comparison to similar cases. *See Chester*, 526 Pa. at 615, 587 A.2d at 1385. On direct review, the Pennsylvania Supreme Court relied on information compiled by the Pennsylvania Death Penalty Study,[37] which reviews all cases resulting in a conviction for first degree murder since 1978. The court concluded that "the sentence of death imposed in this case is not excessive or disproportionate to similarly decided cases. In fact, the language of the death penalty statute requires imposition of the death penalty in this case." *Chester*, 526 Pa. at 615, 587 A.2d at 1385.

On PCRA review and in this petition, Laird contends that the information maintained by the Administrative Office of the Pennsylvania Courts was flawed because the database contained a number of significant errors and the data collection methods did not consider death-eligible cases where defendants entered a plea of guilty. The Pennsylvania Supreme Court stated on PCRA review that Laird had failed "to articulate a specific prejudice" to his case, *Laird*, 555 Pa. at 660, 726 A.2d at 361, and then concluded that "[t]his generic attack on the data compilation system fails to state a claim for relief as it specifically relates to petitioner." *Id.*

▮▮▮ This Court concludes that petitioner is not entitled to habeas relief on this issue. As explained by the Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), "proportionality review is not constitutionally required."[38] Where a state supreme court undertakes its proportionality review in good faith and finds that a sentence is appropriate, courts may not

---

**36.** The version of 42 Pa. Cons.Stat. Ann. § 9711(h)(3) that was applicable in petitioner's case provided as follows: "The Supreme Court shall affirm the sentence of death unless it determines that: ... (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." 42 Pa. Cons.Stat. Ann. § 9711(h)(3) (West 1982 & Supp.1991) (last amended Dec. 22, 1989). Section 9711(h)(3)(iii) was abolished by statute dated June 25, 1997.

**37.** The study was formulated pursuant to requirements set forth by the Pennsylvania Supreme Court in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984).

**38.** The Court notes that, although proportionality review is not constitutionally required, when state law creates an entitlement to such a review, deprivation of that review may constitute a due process violation. *See, e.g., Wilkins v. Bowersox*, 933 F.Supp. 1496, 1525 (W.D.Mo.1996) ("The Court finds that [petitioner] had a substantial and legitimate expectation that the Missouri Supreme Court's proportionality review would be a thorough and meaningful one.... However, the record shows that the court did not consider certain facts necessary for an adequate review in this case."), *aff'd*, 145 F.3d 1006 (8th Cir.1998), *cert. denied*, 525 U.S. 1094, 119 S.Ct. 852, 142 L.Ed.2d 705 (1999).

assume that a particular death sentence is being "'wantonly and freakishly' imposed—and thus that the sentence is ... disproportionate within any recognized meaning of the Eighth Amendment." *Id.* at 655–56, 110 S.Ct. 3047 (quoting *McCleskey v. Kemp,* 481 U.S. 279, 308, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Pulley v. Harris,* 465 U.S. 37, 44, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)). As proportionality review is not constitutionally required and petitioner has not presented any evidence to suggest that the Pennsylvania Supreme Court undertook its review in bad faith, this claim (Claim IX) does not provide a ground for habeas relief.

### 8. *Aggravating Circumstance of Torture*

Petitioner contends that the aggravating circumstance of torture [39] was improperly applied because the evidence at trial tended to show that petitioner and/or his co-defendant killed decedent, but did not show that decedent suffered torture (Claim XI). In addition, petitioner argues that the jury instructions on the aggravating circumstance of torture failed to inform the jury that it must find that each defendant possessed the intent to torture in order to find the aggravating circumstance applicable to both defendants. Respondents argue that this claim was not raised as a federal constitutional issue to the state courts and that any federal constitutional claim is thus procedurally defaulted. Respondents also contend that the coroner's testimony proved that Milano had been tortured and that the state court's disposition of this issue did not result in a decision that is contrary to, or an unreasonable application of, federal law.

The Court first notes that this claim was presented as a state law issue on petitioner's direct appeal and that petitioner's counsel on direct appeal conceded that "[t]he trial court clearly charged the jury with the correct language of the circumstance as well as the requirement of *specific* intent to torture." Br. for Appellant at 58 (July 19, 1989) (emphasis in original). The claim was not pursued on PCRA appeal. However, the Court concludes that the aspect of this claim regarding evidentiary sufficiency was automatically exhausted by the Pennsylvania Supreme Court's mandatory review, which requires the court to conduct an examination of whether "the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." 42 Pa. Cons.Stat. Ann. § 9711(h)(3)(ii). In this case, the jury found two aggravating circumstances—that "the defendant committed the killing while in the perpetration of a felony, [42 Pa. Cons.Stat. Ann. § 9711(d)(6),] and (d)(8) the offense was committed by means of torture." *Laird,* 555 Pa. at 636 n. 2, 726 A.2d at 349 n. 2.

Having concluded that petitioner's claim regarding the question of evidentiary sufficiency to support the aggravating circumstance of torture is not procedurally defaulted, federal review of the claim is not foreclosed. The claim that the jury instruction was improper, however, does not fall squarely into the scope of review anticipated by Pennsylvania's mandatory appellate review scheme as the underlying facts of the claim do not present an error that implicates the grounds for relief set forth in § 9711(h)(3). Thus, the Court concludes that this portion of the claim is procedurally defaulted and federal habeas relief on petitioner's challenge to the por-

---

**39.** The aggravating circumstance of torture was applied to both petitioner and his co-defendant. As set forth by 42 Pa. Cons.Stat. Ann. § 9711(d), "Aggravating circumstances shall be limited to the following: ... (8) The offense was committed by means of torture."

tion of the jury charge regarding the aggravating circumstance of torture is foreclosed.

With respect to the question whether the evidence presented at trial was sufficient to support the aggravating circumstance of torture, the Pennsylvania Supreme Court wrote the following on direct review:

> To establish the aggravating circumstance of torture, the Commonwealth must prove that the defendant intended to inflict a considerable amount of pain and suffering on the victim which is unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity. *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699 (1989). This proof is separate from that which supports a finding of specific intent to kill. *Commonwealth v. Pursell*, 508 Pa. 212, 239, 495 A.2d 183, 196 (1985). Implicit in the definition of torture is the concept that the pain and suffering imposed on the victim was unnecessary, or more than needed to effectuate the demise of the victim. *See id.*

Appellants' argument seems premised upon the notion that because Anthony Milano was rendered unconscious soon after the attack began and therefore probably did not suffer any pain, the Commonwealth cannot prove that appellants had the intent to inflict excessive pain. This argument is patently fallacious.... The fact that, by some biological miracle, Anthony Milano was spared the severe pain of the injuries which ended his life does not absolve appellants of responsibility for the severity of the injuries they inflicted. Clearly, by slashing Milano's throat more times than even the coroner could count, appellants intended to inflict more

pain and suffering than was necessary to effectuate Milano's demise.

*Chester*, 526 Pa. at 607, 587 A.2d at 1381.

As a general rule, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). As discussed above, in order to establish the aggravating circumstance of torture under Pennsylvania state law, the Commonwealth must prove an intent to inflict considerable pain and suffering on the victim. At trial, the coroner testified that decedent had been slashed more times around his neck and head than the coroner could count and that decedent had been beaten, punched and kicked. There was also evidence that Milano had been conscious during the killing, but unable to protect himself, and that he ultimately may have choked on his own blood. Given this evidence, the state supreme court's determination that there was sufficient evidence to establish the aggravating circumstance of torture was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Having concluded that the state court's disposition of the question regarding the sufficiency of the evidence to establish torture was a reasonable determination of the facts considering the evidence presented at trial and did not result in a decision that was contrary to, or an unreasonable application of, federal law, habeas relief is not warranted on this issue. Petitioner's claim regarding the adequacy of the jury instructions regarding the aggravating circumstance of torture is procedurally defaulted and federal habeas review of this issue is foreclosed. Accordingly, this claim (Claim XI) does not provide a basis for federal habeas relief.

### 9. Prosecutorial Argument at Sentencing

Petitioner argues that the prosecution's closing argument during sentencing was improper in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments (Claim XIII(A)). Specifically, petitioner avers that the prosecution's sentencing phase summation (a) was designed to make the jury think that the decision of life or death lay elsewhere; (b) appealed to vengeance; (c) improperly commented on petitioner's silence in violation of his Fifth Amendment right against self incrimination; and (d) denigrated petitioner's penalty phase defense. Respondents contend that this claim is procedurally defaulted and that the prosecution's summation was proper because it was not designed to prejudice the jury.

On direct review, much of this claim was presented to the Pennsylvania Supreme Court in substantially the same language as that used in the presentation of the claim to this court; petitioner identified specific portions of the prosecutor's closing statement to which he objected and cited *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in support of his claim regarding the jury's responsibility (part (a)).[40] On PCRA review, petitioner's presentation of the claim was essentially identical to the presentation of this claim to this Court; the Pennsylvania Supreme Court declined to reach the merits of the claim on PCRA, concluding that it was previously litigated on direct appeal. Accordingly, the Court concludes that the claim is exhausted and not procedurally defaulted.

The Court next turns to the question of what standard of review applies to each aspect of the claim. On direct appeal, the Pennsylvania Supreme Court did not address all elements of petitioner's claim; it only discussed petitioner's argument with respect to the prosecutor's comments on petitioner's silence (part (c)). In addition, with respect to part (c), it is unclear whether the state court analyzed relevant United States Supreme Court precedent; the Court thus concludes that this aspect of the claim was not adjudicated on the merits by the Court below. Accordingly, this claim will be analyzed under the pre-AEDPA standard and the Court will exercise its independent judgment.

#### a. The Prosecution's Representation of the Jury's Responsibility

Petitioner objects to the following portion of the prosecution's closing argument during the penalty phase on the ground that it improperly conveyed to the jury that it was not responsible for deciding whether or not to impose a sentence of death: "I will not send you on a guilt trip. I will not use words like you have the power of life and death. Because you don't. That's a power not given to people." Trial Tr. at 788–89 (May 20, 1988). Subsequently, the following events occurred:

> [Mr. RUBENSTEIN:] Now you may say what an awesome responsibility, but you don't decide life and death.
>
> MR. ELGART: Objection, Your Honor.
>
> MR. RUBENSTEIN: They do. You follow the law.
>
> THE COURT: Objection sustained.
>
> MR. RUBENSTEIN: And I would suggest—

---

**40.** In the alternative, petitioner argues that this claim is not procedurally defaulted as a result of the Pennsylvania mandatory appellate review, *see supra* Part III(B). Having concluded that this claim is exhausted and is not procedurally defaulted, the Court declines to reach the issue of whether this claim is one that is automatically exhausted pursuant to the Pennsylvania automatic appellate review statute, 42 Pa. Cons.Stat. Ann. § 9711(h).

THE COURT: On that one point.

*Id.* at 790.

The United States Supreme Court has held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. 2633. In *Caldwell,* the prosecution argued to the jury in summation that the jury's conclusion regarding whether to impose the death sentence is reviewable on appeal. *Id.* at 325, 105 S.Ct. 2633. The Supreme Court concluded that the prosecutor's attempt to minimize the jury's sense of responsibility for determining defendant's sentence may have had an effect on the jury, rendering defendant's death sentence unreliable in violation of the Eighth Amendment. *Id.* at 341, 105 S.Ct. 2633.

This case, however, is distinguishable from *Caldwell.* At petitioner's trial, the prosecutor, as set forth *supra,* stated that the jury did not have the power of life and death, suggesting that is not a power given to people. He then stated, in the course of trial counsel's objection, that the jury was to follow the law. These comments, unlike the argument made to the jury in *Caldwell,* do not suggest that the jury is not ultimately responsible for fixing sentence. In addition, any suggestion to the jury that it was not responsible for determining petitioner's sentence was cured by the following instruction subsequently given by the trial court: "Remember that you are not merely recommending a punishment. The verdict you will return will actually fix and set the punishment at either death or life imprisonment." Trial Tr. at 803 (May 20, 1988). With this instruction, the trial court charged the jury with its "truly awesome responsibility," *Caldwell,* 472 U.S. at 329, 105 S.Ct. 2633 (quotation omitted), of

fixing petitioner's and his co-defendant's sentences. Having determined that the jury in this case was properly informed as to its role and responsibility, the Court concludes that this aspect of petitioner's claim does not warrant habeas relief.

### b. Prosecutor's Appeal to Vengeance

 Petitioner also contends that the prosecutor's closing argument during the sentencing phase improperly appealed to vengeance. During his sentencing phase summation, the prosecutor presented the following argument to the jury:

> And sometimes it comes through as a first degree murder which is so aggravating, so far beyond the pale that twelve people sitting as the conscience of the community, as Mr. Elgart says, can send a message, they can send a message and the message is this: That you, as twelve people, taking an oath to follow the law say we will not tolerate this; and you as twelve people sworn to uphold the law, to do for all of us, will do just that. You will follow the law. You will find the aggravating circumstances.
>
> . . . .
>
> That is the law. We hand it to you. You have come this far. We ask you to join hands and hearts and minds one more time, one more time and send the very message that you will follow the law and render justice in this case.

Trial Tr. at 794–95 (May 20, 1988).

As set forth *supra* Part IV(A)(4), the central inquiry in evaluating a claim of improper prosecutorial argument such as this one is whether the trial was so infected with unfairness that the resulting conviction was a denial of due process. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). On this issue, the Third Cir-

cuit observed, in the context of a death penalty proceeding, that due to the "surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices." *Lesko v. Lehman,* 925 F.2d 1527, 1541 (3d Cir.1991).

In *Lesko,* the prosecutor made the following argument to the jury during sentencing:

> So I'll say this: Show them sympathy. If you feel that way, be sympathetic. Exhibit the same sympathy that was exhibited by these men on January 3rd, 1980. No more. No more.

> I want you to remember this: We have a death penalty for a reason. Right now, the score is John Lesko and Michael Travaglia two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty.

*Lesko,* 925 F.2d at 1540–41 (quoting Trial Tr. at 1701–02). The Third Circuit concluded that the above argument was improperly directed at the jury's passion and prejudice, and that the prosecutor "exceeded the bounds of permissible advocacy by imploring the jury to make its death penalty determination in the cruel and malevolent manner shown by the defendants" when they committed the murders for which they had previously been found guilty. *Id.* at 1545.

In this case, in evaluating whether petitioner was denied his right to a fair trial as a result of the prosecutorial argument, the Court must look at the prosecution's comments in the context of the trial. The Court concludes that the prosecutor's argument does not encourage a verdict based on passion and prejudice to the same degree as the prosecution's argument in *Lesko.* The *Lesko* prosecutor's appeal to the jury to settle society's score

with the defendants in that case is substantially more prejudicial than the argument presented in petitioner's case, which suggested that the jury send a message by following the law and finding the existence of aggravating circumstances. In addition, in the final sentencing instructions, the trial court charged the jury regarding the jury's duty to carefully consider the aggravating and mitigating circumstances with respect to each defendant and expressly told the jury that it "should not decide these issues out of any feelings of vengeance or prejudice towards any defendant." Trial Tr. at 801 (May 20, 1988). The Court thus concludes, under all of the circumstances, that the prosecutor's closing argument in this case, although somewhat provocative, did not improperly encourage the jury to render a verdict of death based on passion and prejudice. Accordingly, petitioner's claim with respect to this issue provides no basis for relief.

### c. Comments Regarding Petitioner's Silence

Petitioner's next argument regarding the prosecution's summation at sentencing concerns the prosecutor's comments about petitioner's silence. During sentencing, the prosecutor stated:

> Some of this stuff is emotional, but if there's one thing I would like you to consider, and I have a feeling you've thought about it, when you are asked to be sympathetic and to show mercy and when you are asked to consider what they're all about, they shed not one tear, not one tear. They have not shown one drop of remorse for what they have done, not now. Even now. Even now.

> . . . .

> Even as I speak, there is no emotion. They just sit there and listen to me.

Trial Tr. at 789, 793 (May 20, 1988). Petitioner contends that these statements were

an improper comment on petitioner's penalty phase exercise of his Fifth Amendment right to remain silent.

It is well settled that the Fifth Amendment prohibits a prosecutor from commenting to the jury regarding the defendant's failure to testify at trial. *See Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). As explained by the Supreme Court, a prosecutor is likewise forbidden from commenting on a defendant's failure to testify at a capital sentencing hearing as there is "no basis to distinguish between the guilt and penalty phases of [a] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned.... Any effort by the State to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment." *Estelle v. Smith*, 451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *see also Lesko*, 925 F.2d at 1542.

On direct review, the Pennsylvania Supreme Court determined that this comment was merely a summary of the evidence presented at trial and that these remarks "were not calculated to inflame the passions of the jury." *Chester*, 526 Pa. at 600, 587 A.2d at 1378. As it is unclear from the Pennsylvania Supreme Court's discussion whether that court considered relevant United States Supreme Court precedent on this issue, this Court concludes that this claim was not adjudicated on the merits. Accordingly, the Court will use its independent judgment in analyzing this aspect of petitioner's claim.

In evaluating a claim such as this one, the Court must determine " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *Bontempo v. Fenton*, 692 F.2d 954, 959 (3d Cir.1982) (quoting *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir.1971)) *quoted in Lesko*, 925 F.2d at 1544. The prosecutor's comment must be examined in its trial context. *Lesko*, 925 F.2d at 1544.

In *Lesko*, the Third Circuit found the following closing argument to be an impermissible comment on a defendant's failure to testify: "John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry." *Lesko*, 925 F.2d at 1540 (quoting Trial Tr. at 1697). Evaluating this statement in the context of Lesko's trial, the Third Circuit concluded that this was an improper comment on Lesko's failure to testify regarding the merits of the case.

 The Court reaches the same conclusion in this case. In this case, the language used by the prosecutor was of such a character that the jury would necessarily consider it to be a comment on the defendant's failure to testify at sentencing and apologize for his crime. Although the Court recognizes that a defendant's demeanor and degree of remorse may be relevant factors at sentencing, the comments in this case were not mere comments on petitioner's demeanor. As in *Lesko*, the prosecution's comment in this case was a clear condemnation of petitioner's failure to testify about his role in the murder of Anthony Milano. Such testimony would almost certainly have been self-incriminating. *See Lesko*, 925 F.2d at 1544. In addition, "[i]t also would have almost certainly contradicted [petitioner's] steadfast position throughout the trial that he did not intend to kill [the decedent], but was simply a passive observer to the [killing]." *Lesko*, 925 F.2d at 1544.

A conclusion that the prosecutor's comments were improper is not sufficient, however, to warrant habeas relief. As discussed *supra* Part IV(A)(4), the Court must evaluate whether the improper comments so infected the trial that petitioner was denied due process. Although the prosecutor's comments, in isolation, would not meet this stringent standard, when considered together with the fact that petitioner was shackled during the penalty phase, that the jury instruction with respect to mitigating circumstances was flawed, and that trial counsel's performance during the penalty phase was constitutionally deficient, the Court concludes that the prosecutor's comments on petitioner's failure to testify contributed to the fundamental unfairness of petitioner's sentencing hearing. In combination with the other meritorious penalty phase claims noted above, this part of this claim (Claim XIII(A)) provides a basis for habeas relief.

### d. Denigration of Petitioner's Penalty Phase Defense

Finally, petitioner argues that the prosecutor improperly denigrated petitioner's penalty phase defense when the prosecution stated "I am not going to quote from the [B]ible. I'm not going to do that. I'm not going to insult your intelligence." Trial Tr. at 795 (May 20, 1988). During his summation to the jury, petitioner's trial counsel, Ron Elgart, quoted portions of the Bible. *See id.* at 782–83. Insofar as the above comment by the prosecutor was intended to denigrate petitioner's penalty phase defense, the Court concludes the comment was harmless.

For the foregoing reasons, the Court concludes that one part of this claim (Claim XIII(A)), when considered in combination with the other errors that occurred at petitioner's sentencing, provides a basis for federal habeas relief. The oth-

er parts of Claim XIII(A) do not, however, provide grounds for relief.

### E. Overall Ineffective Assistance Claim

Petitioner contends that, to the extent that state court counsel failed to raise and/or properly litigate the issues discussed in Laird's federal habeas petition, they were ineffective in violation of the Sixth, Eighth and Fourteenth Amendments (Claim XX). This Court, having concluded that petitioner's prior counsel was ineffective in certain respects as discussed *supra,* declines to reach address petitioner's overall ineffectiveness claim.

### F. Overall Cumulative Prejudice Claim

Petitioner's final contention is that the prejudicial effects of his claims are to be considered cumulatively and that such cumulative error may warrant federal habeas relief regardless of whether the underlying claims of error justify relief. Having determined that petitioner's first degree murder conviction and death sentence must be vacated, the Court declines to reach petitioner's claim of cumulative prejudice.

### V. CONCLUSION

For the foregoing reasons, petitioner's Petition for a Writ of Habeas Corpus will be granted in part. An appropriate order follows.